**Volume 1 of 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

NAVAJO NATION; HAVASUPAI TRIBE;
REX TILOUSI; DIANNA UQUALLA;
SIERRA CLUB; WHITE MOUNTAIN
APACHE NATION; YAVAPAI-APACHE
NATION; THE FLAGSTAFF ACTIVIST
NETWORK,
　　　　　　*Plaintiffs-Appellants,*

　　　　　　　and

HUALAPAI TRIBE; NORRIS NEZ; BILL
BUCKY PRESTON; HOPI TRIBE;
CENTER FOR BIOLOGICAL DIVERSITY,
　　　　　　　　　*Plaintiffs,*

　　　　　　　v.

UNITED STATES FOREST SERVICE;
NORA RASURE, in her official
capacity as Forest Supervisor,
Responsible Officer, Coconino
National Forest; HARV FORSGREN,
appeal deciding office, Regional
Forester, in his official capacity,
　　　　　　*Defendants-Appellees,*

ARIZONA SNOWBOWL RESORT
LIMITED PARTNERSHIP,
　　*Defendant-intervenor-Appellee.*

No. 06-15371

D.C. Nos.
CV-05-01824-PGR
CV-05-01914-PGR
CV-05-01949-PGR
CV-05-01966-PGR

10033

NAVAJO NATION; HUALAPAI TRIBE;
NORRIS NEZ; BILL BUCKY PRESTON;
HAVASUPAI TRIBE; REX TILOUSI;
DIANNA UQUALLA; SIERRA CLUB;
WHITE MOUNTAIN APACHE NATION;
YAVAPAI-APACHE NATION; CENTER
FOR BIOLOGICAL DIVERSITY; THE
FLAGSTAFF ACTIVIST NETWORK,
                              *Plaintiffs,*

               and

HOPI TRIBE,
                    *Plaintiff-Appellant,*

               v.

UNITED STATES FOREST SERVICE;
NORA RASURE, in her official
capacity as Forest Supervisor,
Responsible Officer, Coconino
National Forest; HARV FORSGREN,
appeal deciding office, Regional
Forester, in his official capacity,
                  *Defendants-Appellees,*

ARIZONA SNOWBOWL RESORT
LIMITED PARTNERSHIP,
     *Defendant-intervenor-Appellee.*

No. 06-15436

D.C. Nos.
CV-05-01824-PGR
CV-05-01914-PGR
CV-05-01949-PGR
CV-05-01966-PGR

HUALAPAI TRIBE; NORRIS NEZ; BILL
BUCKY PRESTON,
*Plaintiffs-Appellants,*

v.

UNITED STATES FOREST SERVICE;
NORA RASURE, in her official
capacity as Forest Supervisor,
Responsible Officer, Coconino
National Forest; HARV FORSGREN,
appeal deciding office, Regional
Forester, in his official capacity,
*Defendants-Appellees.*

No. 06-15455
D.C. No.
CV-05-01824-PGR
OPINION

Appeal from the United States District Court
for the District of Arizona
Paul G. Rosenblatt, District Judge, Presiding

Argued and Submitted
December 11, 2007—Pasadena, California

Filed August 8, 2008

Before: Alex Kozinski, Chief Judge, Harry Pregerson,
Diarmuid F. O'Scannlain, Pamela Ann Rymer,
Andrew J. Kleinfeld, Barry G. Silverman,
William A. Fletcher, Raymond C. Fisher, Richard R. Clifton,
Carlos T. Bea, and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Bea;
Dissent by Judge W. Fletcher

**COUNSEL**

Howard M. Shanker (argued), Laura Lynn Berglan, The Shanker Law Firm, PLC, Tempe, Arizona; Jack F. Trope (argued), Association on American Indian Affairs, Rockville, Maryland; William C. Zukosky, DNA-People's Legal Services, Flagstaff, Arizona; Terence M. Gurley and Zackeree Kelin, DNA-People's Legal Services, Window Rock, Arizona; Lisa A. Reynolds, James E. Scarboro (argued), Arnold & Porter LLP, Denver, Colorado; Anthony S. Canty, Lynelle Kym Hartway, Office of General Counsel, The Hopi Tribe, Kykotsmovi, Arizona, for the plaintiffs-appellants.

Catherine E. Stetson (argued), Andrew L. Spielman, Hogan & Hartson LLP, Washington, DC; Janice M. Schneider, Bruce Babbitt, Latham & Watkins LLP, Washington, DC; Sue Ellen Wooldridge, Matthew J. McKeown, Andrew C. Mergen, Kathryn E. Kovacs, Lane M. McFadden (argued), United States Department of Justice, Environment & Natural Resources Division, Washington, DC; Philip A. Robbins, Paul G. Johnson, Michael J. O'Connor, John J. Egbert, Jennings, Strouss & Salmon, P.L.C., Phoenix, Arizona, for the defendants-appellees.

Geraldine Link, National Ski Areas Association, Lakewood, Colorado; Ezekiel J. Williams, Jacy T. Rock, Faegre & Benson LLP, Denver, Colorado; Glenn E. Porzak, P. Fritz Holleman, Eli A. Feldman, Porzak Browning & Bushong LLP, Boulder, Colorado; for the National Ski Areas Association as Amicus Curiae in Support of the defendants-appellees.

William Perry Pendley, Mountain States Legal Foundation, Lakewood, Colorado; for the Mountain States Legal Foundation as Amicus Curiae in Support of the defendants-appellees.

## OPINION

BEA, Circuit Judge:

In this case, American Indians ask us to prohibit the federal government from allowing the use of artificial snow for skiing on a portion of a public mountain sacred in their religion. At the heart of their claim is the planned use of recycled wastewater, which contains 0.0001% human waste, to make artificial snow.[1] The Plaintiffs claim the use of such snow on a sacred mountain desecrates the entire mountain, deprecates their religious ceremonies, and injures their religious sensibilities. We are called upon to decide whether this government-approved use of artificial snow on government-owned park land violates the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.* We hold that it does not, and affirm the district court's denial of relief on all grounds.

---

[1]It appears that some of the Plaintiffs would challenge any means of making artificial snow, even if no recycled wastewater were used. Panel Oral Argument (Sept. 14, 2006) at 12:25-12:45 (Hopi Plaintiffs).

\* \* \*

Plaintiff Indian tribes and their members consider the San Francisco Peaks in Northern Arizona to be sacred in their religion.[2] They contend that the use of recycled wastewater to make artificial snow for skiing on the Snowbowl, a ski area that covers approximately one percent of the San Francisco Peaks, will spiritually contaminate the entire mountain and devalue their religious exercises. The district court found the Plaintiffs' beliefs to be sincere; there is no basis to challenge that finding. The district court also found, however, that there are no plants, springs, natural resources, shrines with religious significance, or religious ceremonies that would be physically affected by the use of such artificial snow. No plants would be destroyed or stunted; no springs polluted; no places of worship made inaccessible, or liturgy modified. The Plaintiffs continue to have virtually unlimited access to the mountain, including the ski area, for religious and cultural purposes. On the mountain, they continue to pray, conduct their religious ceremonies, and collect plants for religious use.

Thus, the sole effect of the artificial snow is on the Plaintiffs' subjective spiritual experience. That is, the presence of the artificial snow on the Peaks is offensive to the Plaintiffs' feelings about their religion and will decrease the spiritual fulfillment Plaintiffs get from practicing their religion on the mountain. Nevertheless, a government action that decreases the spirituality, the fervor, or the satisfaction with which a

---

[2]The Plaintiffs-Appellants in this case are the Navajo Nation, the Hopi Tribe, the Havasupai Tribe, the Hualapai Tribe, the Yavapai-Apache Nation, the White Mountain Apache Nation, Bill Bucky Preston (a member of the Hopi Tribe), Norris Nez (a member of the Navajo Nation), Rex Tilousi (a member of the Havasupai Tribe), Dianna Uqualla (a member of the Havasupai Tribe), the Sierra Club, the Center for Biological Diversity, and the Flagstaff Activist Network.

The Defendants-Appellees are the United States Forest Service; Nora Rasure, the Forest Supervisor; Harv Forsgren, the Regional Forester; and Intervenor Arizona Snowbowl Resort Limited Partnership.

believer practices his religion is not what Congress has labeled a "substantial burden"—a term of art chosen by Congress to be defined by reference to Supreme Court precedent —on the free exercise of religion. Where, as here, there is no showing the government has coerced the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs, there is no "substantial burden" on the exercise of their religion.

Were it otherwise, any action the federal government were to take, including action on its own land, would be subject to the personalized oversight of millions of citizens. Each citizen would hold an individual veto to prohibit the government action solely because it offends his religious beliefs, sensibilities, or tastes, or fails to satisfy his religious desires. Further, giving one religious sect a veto over the use of public park land would deprive others of the right to use what is, by definition, land that belongs to everyone.

"[W]e are a cosmopolitan nation made up of people of almost every conceivable religious preference." *Braunfeld v. Brown*, 366 U.S. 599, 606 (1961). Our nation recognizes and protects the expression of a great range of religious beliefs. Nevertheless, respecting religious credos is one thing; requiring the government to change its conduct to avoid any perceived slight to them is quite another. No matter how much we might wish the government to conform its conduct to our religious preferences, act in ways that do not offend our religious sensibilities, and take no action that decreases our spiritual fulfillment, no government—let alone a government that presides over a nation with as many religions as the United States of America—could function were it required to do so. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 452 (1988).

## I.  Factual and Procedural Background[3]

The Snowbowl ski area ("the Snowbowl") is located on federally owned public land and operates under a special use permit issued by the United States Forest Service ("the Forest Service"). *Navajo Nation v. U.S. Forest Serv.*, 408 F. Supp. 2d 866, 883-84 (D. Ariz. 2006). Specifically, the Snowbowl is situated on Humphrey's Peak, the highest of the San Francisco Peaks ("the Peaks"), located within the Coconino National Forest in Northern Arizona. *Id.* at 869, 883. The Peaks cover about 74,000 acres. *Id.* at 883. The Snowbowl sits on 777 acres, or approximately one percent of the Peaks. *Id.* at 883-84.

The Forest Service designated the Snowbowl as a public recreation facility after finding the Snowbowl "represented an opportunity for the general public to access and enjoy public lands in a manner that the Forest Service could not otherwise offer in the form of a major facility anywhere in Arizona." *Id.* at 884. The Snowbowl has been in operation since the 1930s and is the only downhill ski area within the Coconino National Forest.[4] *Id.*

The Peaks have long-standing religious and cultural significance to Indian tribes. The tribes believe the Peaks are a living entity. *Id.* at 887. They conduct religious ceremonies, such as the Navajo Blessingway Ceremony, on the Peaks. *Id.* The

---

[3]We find no clear error in the district court's findings of fact, so our statement of the facts is based on the district court opinion. The dissent cursorily asserts that "the majority misstates the evidence below," Dissent at 10077, but fails to cite any fact in the opinion that it claims to be misstated, or as to which the district court erred in its findings of fact.

[4]In addition to downhill skiing, many other activities are conducted on the Peaks: sheep and cattle grazing, timber harvesting, road building, mining, motorcross, mountain biking, horseback riding, hiking, and camping. *Navajo Nation*, 408 F. Supp. 2d at 884. Further, gas and electric transmission lines, water pipelines, and cellular towers are located on the Peaks. *Id.*

tribes also collect plants, water, and other materials from the Peaks for medicinal bundles and tribal healing ceremonies. *Id.* According to the tribes, the presence of the Snowbowl desecrates for them the spirituality of the Peaks. *Id.* Certain Indian religious practitioners believe the desecration of the Peaks has caused many disasters, including the September 11, 2001 terrorist attacks, the Columbia Space Shuttle accident, and increases in natural disasters. *Id.*

This case is not the first time Indian tribes have challenged the operation of the Snowbowl. In 1981, before the enactment of RFRA, the tribes brought a challenge to the Forest Service's approval of a number of upgrades to the Snowbowl, including the installation of new lifts, slopes, and facilities. *See Wilson v. Block*, 708 F.2d 735, 739 (D.C. Cir. 1983).[5] The tribes asserted that the approved upgrades would "seriously impair their ability to pray and conduct ceremonies upon the Peaks" and to gather from the Peaks sacred objects necessary to their religious practices. *Id.* at 740. According to the tribes, this constituted an unconstitutional burden on the exercise of their religion under the Free Exercise Clause of the First Amendment. *Id.*

The D.C. Circuit in *Wilson* rejected the Indian tribes' challenge to the upgrades. *Id.* at 739-45. Although the court noted that the proposed upgrades would cause the Indians "spiritual disquiet," the upgrades did not impose a sufficient burden on the exercise of their religion: "Many government actions may offend religious believers, and may cast doubt upon the veracity of religious beliefs, but unless such actions penalize faith, they do not burden religion." *Id.* at 741-42. The Indian tribes have continued to conduct religious activities on the Peaks ever since. *Navajo Nation*, 408 F. Supp. 2d at 884.

---

[5]At the time *Wilson* was decided, artificial snow from recycled wastewater was not used on the Snowbowl and was thus not at issue.

With this brief background, we turn to the Plaintiffs' challenge in this case. In 2002, the Snowbowl submitted a proposal to the Forest Service to upgrade its operations. *Id.* at 885. The proposal included a request for artificial snowmaking from recycled wastewater for use on the Snowbowl. *Id.* The Snowbowl had suffered highly variable snowfall for several years; this resulted in operating losses that threatened its ski operation. *Id.* at 884-85, 907. Indeed, the district court found that artificial snowmaking is "needed to maintain the viability of the Snowbowl as a public recreational resource." *Id.* at 907.

The recycled wastewater to be used for snowmaking is classified as "A+" by the Arizona Department of Environmental Quality ("ADEQ").[6] *Id.* at 887. A+ recycled wastewater is the highest quality of recycled wastewater recognized by Arizona law and may be safely and beneficially used for many purposes, including irrigating school ground landscapes and food crops. *See* Ariz. Admin. Code R18-11-309 tbl. A. Further, the ADEQ has specifically approved the use of recycled wastewater for snowmaking. *Id.*

In addition to being used to make snow, the recycled wastewater also will be used for fire suppression on the Peaks. *Navajo Nation*, 408 F. Supp. 2d at 886. The pipeline that will transport the recycled wastewater to the Snowbowl will be equipped with fire hydrants to provide water for fire suppression in rural residential areas and to fight forest fires. *Id.* Fur-

---

[6]The recycled wastewater that will be used at the Snowbowl "will undergo specific advanced treatment requirements, including tertiary treatment with disinfection. In addition, the reclaimed water will comply with specific monitoring requirements, including frequent microbiological testing to assure pathogens are removed, and reporting requirements." *Navajo Nation*, 408 F. Supp. 2d at 887. Further, the recycled wastewater will "comply with extensive treatment and monitoring requirements under three separate permit programs: the Arizona Pollutant Discharge Elimination System ("AZPDES") Permit, the Arizona Aquifer Protection Permit Program, and the Water Reuse Program." *Id.*

ther, a reservoir of recycled wastewater will be kept on the Snowbowl for forest fire suppression. *Id.*

The Forest Service conducted an extensive review of the Snowbowl's proposal. As part of its review, the Forest Service made more than 500 contacts with Indian tribes, including between 40 and 50 meetings, to determine the potential impact of the proposal on the tribes.[7] *Id.* at 885. In a December 2004 Memorandum of Agreement, the Forest Service committed to, among other things: (1) continue to allow the tribes access to the Peaks, including the Snowbowl, for cultural and religious purposes; and (2) work with the tribes periodically to inspect the conditions of the religious and cultural sites on the Peaks and ensure the tribes' religious activities on the Peaks are uninterrupted. *Id.* at 900-01.

---

[7]Of course, the impact of the Snowbowl proposal on the American Indian tribes is not the only factor the Forest Service must consider in administering the Coconino National Forest. Congress has directed the Forest Service to manage the National Forests for "outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. Additionally, the Forest Service must follow a number of other directives under federal laws and executive orders in administering the Coconino National Forest, including, but not limited to: NEPA; NHPA; the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1531 *et seq.*; the National Forest Ski Area Permit Act of 1986, 16 U.S.C. § 497b; the Wilderness Act, 16 U.S.C. § 1131 *et seq.*; and the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528 *et seq. Navajo Nation*, 408 F. Supp. 2d at 896.

The Forest Service's task is complicated by the number of sacred sites under its jurisdiction. In the Coconino National Forest alone, there are approximately a dozen mountains recognized as sacred by American Indian tribes. *Id.* at 897. The district court found the tribes hold other landscapes to be sacred as well, such as canyons and canyon systems, rivers and river drainages, lakes, discrete mesas and buttes, rock formations, shrines, gathering areas, pilgrimage routes, and prehistoric sites. *Id.* Within the Southwestern Region forest lands alone, there are between 40,000 and 50,000 prehistoric sites. *Id.* The district court also found the Navajo and the Hualapai Plaintiffs consider the entire Colorado River to be sacred. *Id.* at 897-98. New sacred areas are continuously being recognized by the Plaintiffs. *Id.* at 898.

Following the review process, the Forest Supervisor approved the Snowbowl's proposal, including the use of recycled wastewater to make artificial snow, and issued a Final Environmental Impact Statement and a Record of Decision in February 2005. *Id.* at 885-86. The Plaintiffs appealed the Forest Supervisor's decision approving the Snowbowl's proposal to an administrative appeal board within the Forest Service. *Id.* In June 2005, the Forest Service issued its final administrative decision and affirmed the Forest Supervisor's approval of the proposed upgrades. *Id.* at 886.

After their unsuccessful administrative appeal, the Plaintiffs filed this action in federal district court. The Plaintiffs alleged that the Forest Service's authorization of the use of recycled wastewater on the Snowbowl violates: (1) RFRA; (2) NEPA; (3) NHPA; (4) ESA; (5) the Grand Canyon National Park Enlargement Act ("GCEA"), 16 U.S.C. § 228i; and (6) the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*[8] *Id.* at 871. Following cross-motions for summary judgment, the district court denied the Plaintiffs' motions for summary judgment and granted the Defendants' motion for summary judgment on all claims, except the RFRA claim. *Id.* at 869, 908.

After an 11-day bench trial on the RFRA claim, the district court held that the proposed upgrades, including the use of recycled wastewater to make artificial snow on the Peaks, do not violate RFRA. *Id.* at 883, 907. The district court found that the upgrades did not bar the Plaintiffs' "access, use, or ritual practice on any part of the Peaks." *Id.* at 905. As a result, the court held that the Plaintiffs had failed to demonstrate the Snowbowl upgrade "coerces them into violating their religious beliefs or penalizes their religious activity," as required to establish a substantial burden on the exercise of their religion under RFRA. *Id.*

---

[8]On appeal, the Plaintiffs have abandoned their claims under the ESA, GCEA, and NFMA, leaving only the RFRA, NEPA, and NHPA claims.

A three-judge panel of this court reversed the district court in part, holding that the use of recycled wastewater on the Snowbowl violates RFRA, and in one respect, that the Forest Service failed to comply with NEPA. *See Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1029 (9th Cir. 2007). The panel affirmed the grant of summary judgment to the Defendants on four of five NEPA claims and the NHPA claim. *Id.* We took the case en banc to revisit the panel's decision and to clarify our circuit's interpretation of "substantial burden" under RFRA.

## II.   Standard of Review

We review *de novo* the district court's grant of summary judgment. *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 804 (9th Cir. 1999). We review the district court's conclusions of law following a bench trial *de novo* and its findings of fact for clear error. *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 843 (9th Cir. 2004).

## III.   Religious Freedom Restoration Act of 1993

Plaintiffs contend the use of artificial snow, made from recycled wastewater, on the Snowbowl imposes a substantial burden on the free exercise of their religion, in violation of the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* We hold that the Plaintiffs have failed to establish a RFRA violation. The presence of recycled wastewater on the Peaks does not coerce the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, nor does it condition a governmental benefit upon conduct that would violate their religious beliefs, as required to establish a "substantial burden" on religious exercise under RFRA.[9]

---

[9]The Defendants do not contend RFRA is inapplicable to the government's use and management of its own land, which is at issue in this case. Because this issue was not raised or briefed by the parties, we have no occasion to consider it. Therefore, we assume, without deciding, that RFRA applies to the government's use and management of its land, and conclude there is no RFRA violation in this case.

**[1]** RFRA was enacted in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990).[10] In *Smith*, the Supreme Court held that the Free Exercise Clause does not bar the government from burdening the free exercise of religion with a "valid and neutral law of general applicability." *Id.* at 879 (citation and internal quotation marks omitted). Applying that standard, the *Smith* Court rejected the Free Exercise Clause claims of the plaintiffs, who were denied state unemployment compensation after being discharged from their jobs for ingesting peyote for religious purposes. *Id.* at 890.

**[2]** Congress found that in *Smith*, the "Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4). Congress further found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise." *Id.* § 2000bb(a)(2). With the enactment of RFRA, Congress created a cause of action for persons whose exercise of religion is substantially burdened by a government action, regardless of whether the burden results from a neutral law of general applicability. *See id.* § 2000bb-1. RFRA states, in relevant part:

> (a) In general
>
> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

---

[10]In *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court invalidated RFRA as applied to the States and their subdivisions, holding RFRA exceeded Congress's powers under the Enforcement Clause of the Fourteenth Amendment. *Id.* at 532, 536. We have held that RFRA remains operative as to the federal government. *See Guam v. Guerrero*, 290 F.3d 1210, 1220-22 (9th Cir. 2002).

(b) Exception

Government may substantially burden a person's
exercise of religion only if it demonstrates that appli-
cation of the burden to the person—

> (1) is in furtherance of a compelling gov-
> ernmental interest; and

> (2) is the least restrictive means of further-
> ing that compelling governmental interest.

*Id.*

**[3]** To establish a prima facie RFRA claim, a plaintiff must
present evidence sufficient to allow a trier of fact rationally to
find the existence of two elements. First, the activities the
plaintiff claims are burdened by the government action must
be an "exercise of religion." *See id.* § 2000bb-1(a). Second,
the government action must "substantially burden" the plain-
tiff's exercise of religion. *See id.* If the plaintiff cannot prove
either element, his RFRA claim fails. Conversely, should the
plaintiff establish a substantial burden on his exercise of reli-
gion, the burden of persuasion shifts to the government to
prove that the challenged government action is in furtherance
of a "compelling governmental interest" and is implemented
by "the least restrictive means." *See id.* § 2000bb-1(b). If the
government cannot so prove, the court must find a RFRA vio-
lation.

We now turn to the application of these principles to the
facts of this case. The first question is whether the activities
Plaintiffs claim are burdened by the use of recycled waste-
water on the Snowbowl constitute an "exercise of religion."
RFRA defines "exercise of religion" as "any exercise of reli-
gion, whether or not compelled by, or central to, a system of
religious belief." 42 U.S.C. § 2000bb-2(4); 42 U.S.C.
§ 2000cc-5(7)(A). The Defendants do not contest the district

court's holding that the Plaintiffs' religious beliefs are sincere and the Plaintiffs' religious activities on the Peaks constitute an "exercise of religion" within the meaning of RFRA.

**[4]** The crux of this case, then, is whether the use of recycled wastewater on the Snowbowl imposes a "substantial burden" on the exercise of the Plaintiffs' religion. RFRA does not specifically define "substantial burden." Fortunately, we are not required to interpret the term by our own lights. Rather, we are guided by the express language of RFRA and decades of Supreme Court precedent.

### A.

**[5]** Our interpretation begins, as it must, with the statutory language. RFRA's stated purpose is to "restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). RFRA further states "the compelling interest test as set forth in . . . Federal court rulings [prior to *Smith*] is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." *Id.* § 2000bb(a)(5).

Of course, the "compelling interest test" cited in the above-quoted RFRA provisions applies only if there is a substantial burden on the free exercise of religion. That is, the government is not required to prove a compelling interest for its action or that its action involves the least restrictive means to achieve its purpose, unless the plaintiff first proves the government action substantially burdens his exercise of religion. The same cases that set forth the compelling interest test also define what kind or level of burden on the exercise of religion is sufficient to invoke the compelling interest test. *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) (noting the "free exercise inquiry asks whether government has placed a substantial burden" on the free exercise of religion (citing *Yoder*

and other pre-*Smith* decisions)). Therefore, the cases that RFRA expressly adopted and restored—*Sherbert*, *Yoder*, and federal court rulings prior to *Smith*—also control the "substantial burden" inquiry.

It is to those decisions we now turn.

## B.

In *Sherbert*, a Seventh-day Adventist was fired by her South Carolina employer because she refused to work on Saturdays, her faith's day of rest. *Sherbert*, 374 U.S. at 399. Sherbert filed a claim for unemployment compensation benefits with the South Carolina Employment Security Commission, which denied her claim, finding she had failed to accept work without good cause. *Id.* at 399-401. The Supreme Court held South Carolina could not, under the Free Exercise Clause, condition unemployment compensation so as to deny benefits to Sherbert because of the exercise of her faith. Such a condition unconstitutionally forced Sherbert "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.* at 404.[11]

In *Yoder*, defendants, who were members of the Amish religion, were convicted of violating a Wisconsin law that required their children to attend school until the children

---

[11]As the Supreme Court later elaborated:

Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a *burden* upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless *substantial*.

*Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 717-18 (1981) (emphasis added) (discussing *Sherbert*).

reached the age of sixteen, under the threat of criminal sanctions for the parents. *Yoder*, 406 U.S. at 207-08. The defendants sincerely believed their children's attendance in high school was "contrary to the Amish religion and way of life." *Id.* at 209. The Supreme Court reversed the defendants' convictions, holding the application of the compulsory school-attendance law to the defendants "unduly burden[ed]" the exercise of their religion, in violation of the Free Exercise Clause. *Id.* at 207, 220. According to the Court, the Wisconsin law "affirmatively compel[led the defendants], under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id.* at 218.

[6] The Supreme Court's decisions in *Sherbert* and *Yoder*, relied upon and incorporated by Congress into RFRA, lead to the following conclusion: Under RFRA, a "substantial burden" is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*). Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a "substantial burden" within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases.

[7] Applying *Sherbert* and *Yoder*, there is no "substantial burden" on the Plaintiffs' exercise of religion in this case. The use of recycled wastewater on a ski area that covers one percent of the Peaks does not force the Plaintiffs to choose between following the tenets of their religion and receiving a governmental benefit, as in *Sherbert*. The use of recycled wastewater to make artificial snow also does not coerce the Plaintiffs to act contrary to their religion under the threat of civil or criminal sanctions, as in *Yoder*. The Plaintiffs are not fined or penalized in any way for practicing their religion on the Peaks or on the Snowbowl. Quite the contrary: the Forest Service "has guaranteed that religious practitioners would still

have access to the Snowbowl" and the rest of the Peaks for religious purposes. *Navajo Nation*, 408 F. Supp. 2d at 905.

**[8]** The only effect of the proposed upgrades is on the Plaintiffs' subjective, emotional religious experience. That is, the presence of recycled wastewater on the Peaks is offensive to the Plaintiffs' religious sensibilities. To plaintiffs, it will spiritually desecrate a sacred mountain and will decrease the spiritual fulfillment they get from practicing their religion on the mountain. Nevertheless, under Supreme Court precedent, the diminishment of spiritual fulfillment—serious though it may be—is not a "substantial burden" on the free exercise of religion.[12]

---

[12]The dissent's assertion that we misunderstand the "nature of religious belief and practice" is misplaced. *See* Dissent at 10104. One need not study the writings of Sir Francis Bacon, *id.* at 10076, or William James, *id.* at 10105, to understand "religious exercise invariably, and centrally, involves a 'subjective spiritual experience.' " *Id.* at 10105. We agree with the dissent that spiritual fulfillment is a central part of religious exercise. We also note that the Indians' conception of their lives as intertwined with particular mountains, rivers, and trees, which are divine parts of their being, is very well explained in the dissent. Nevertheless, the question in this case is not whether a subjective spiritual experience constitutes an "exercise of religion" under RFRA. That question is undisputed: The Indians' religious activities on the Peaks, including the spiritual fulfillment they derive from such religious activities, are an "exercise of religion."

Rather, the sole question is whether a government action that affects only subjective spiritual fulfillment "substantially burdens" the exercise of religion. For all of the rich complexity that describes the profound integration of man and mountain into one, the burden of the recycled wastewater can only be expressed by the Plaintiffs as damaged spiritual feelings. Under Supreme Court precedent, government action that diminishes subjective spiritual fulfillment does not "substantially burden" religion.

Indeed, the Supreme Court in *Yoder* drew the same distinction between objective and subjective effect on religious exercise that the dissent criticizes us for drawing today: "Nor is the impact of the compulsory-attendance law confined to grave interference with important Amish religious tenets from a *subjective* point of view. It carries with it precisely the kind of *objective* danger to the free exercise of religion that the First

The Supreme Court's decision in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), is on point. In *Lyng*, Indian tribes challenged the Forest Service's approval of plans to construct a logging road in the Chimney Rock area of the Six Rivers National Forest in California. *Id.* at 442. The tribes contended the construction would interfere with their free exercise of religion by disturbing a sacred area. *Id.* at 442-43. The area was an "integral and indispensible part" of the tribes' religious practices, and a Forest Service study concluded the construction "would cause serious and irreparable damage to the sacred areas." *Id.* at 442 (citations and internal quotation marks omitted).

The Supreme Court rejected the Indian tribes' Free Exer-

Amendment was designed to prevent." *Yoder*, 406 U.S. at 218 (emphasis added). Contrary to the dissent's assertions, in *Yoder*, it was not the effect of the high school's secular education on the children's subjective religious sensibilities that constituted the undue burden on the free exercise of religion. Rather, the undue burden was the penalty of criminal sanctions on the parents for refusing to enroll their children in such school. *See Lyng*, 485 U.S. at 457 ("[T]here is nothing whatsoever in the *Yoder* opinion to support the proposition that the 'impact' on the Amish religion would have been constitutionally problematic if the statute at issue had not been coercive in nature."); *Yoder*, 406 U.S. at 218 ("The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs."). Likewise, in *Sherbert*, the protected interest was the receipt of unemployment benefits and not, as the dissent contends, the right to take religious rest on Saturday. *See Sherbert*, 374 U.S. at 410 ("This holding . . . reaffirms a principle that . . . no State may exclude . . . the members of any . . . faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation." (citations and internal quotation marks omitted)). The *Sherbert* Court certainly did not hold public employers were required not to work their Seventh-day Adventist employees on Saturdays, or not to fire them if they refused to work on Saturdays. Hence, the protected interest was not a mandatory day off, but the money from unemployment benefits that voluntarily taking the day off would otherwise forfeit.

cise Clause challenge.[13] The Court held the government plan, which would "diminish the sacredness" of the land to Indians and "interfere significantly" with their ability to practice their religion, did not impose a burden "heavy enough" to violate the Free Exercise Clause. *Id.* at 447-49.[14] The plaintiffs were not "coerced by the Government's action into violating their religious beliefs" (as in *Yoder*) nor did the "governmental action penalize religious activity by denying [the plaintiffs] an equal share of the rights, benefits, and privileges enjoyed by other citizens" (as in *Sherbert*). *See id.* at 449.

The *Lyng* Court, with language equally applicable to this case, further stated:

> The Government does not dispute, and we have no reason to doubt, that the logging and road-building

---

[13]That *Lyng* was a Free Exercise Clause, not RFRA, challenge is of no material consequence. Congress expressly instructed the courts to look to pre-*Smith* Free Exercise Clause cases, which include *Lyng*, to interpret RFRA. *See* 42 U.S.C. § 2000bb(a)(5) ("[T]he compelling interest test as set forth in . . . Federal court rulings [prior to *Smith*] is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.").

[14]Our dissenting colleague is therefore incorrect in his assertion that "*Lyng* did not hold that the road at issue would cause no 'substantial burden' on religious exercise." *See* Dissent at 10092. Although *Lyng* did not use the precise phrase "substantial burden," it squarely held the government plan did not impose a "burden . . . heavy enough" on religious exercise to trigger the compelling interest test: "It is undisputed that the Indian respondents' beliefs are sincere and that the Government's proposed actions will have severe adverse effects on the practice of their religion. Those respondents contend that the burden on their religious practices is heavy enough to violate the Free Exercise Clause unless the Government can demonstrate a compelling need [in its project.] We disagree." *Lyng*, 485 U.S. at 447. Thus, *Lyng* declined to require the government to show a compelling interest *because* the burden on the exercise of the Indians' religion was not "heavy enough"—not, as the dissent asserts, *despite* the presence of a substantial burden on the exercise of their religion. *See* Dissent at 10092.

projects at issue in this case could have devastating effects on traditional Indian religious practices.

\* \* \*

Even if we assume that . . . the [logging] road will "virtually destroy the . . . Indians' ability to practice their religion," the Constitution simply does not provide a principle that could justify upholding [the plaintiffs'] legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires. A broad range of government activities—from social welfare programs to foreign aid to conservation projects—will always be considered essential to the spiritual well-being of some citizens, often on the basis of sincerely held religious beliefs. Others will find the very same activities deeply offensive, and perhaps incompatible with their own search for spiritual fulfillment and with the tenets of their religion.

\* \* \*

No disrespect for these practices is implied when one notes that such beliefs could easily require *de facto* beneficial ownership of some rather spacious tracts of public property.

\* \* \*

The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions. *Whatever rights the Indians may have to the use of the area, however, those rights do not divest*

> *the Government of its right to use what is, after all,*
> *its land.*

*Id.* at 451-53 (citation omitted) (last emphasis added).

Like the Indians in *Lyng*, the Plaintiffs here challenge a
government-sanctioned project, conducted on the govern-
ment's own land, on the basis that the project will diminish
their spiritual fulfillment. Even were we to assume, as did the
Supreme Court in *Lyng*, that the government action in this
case will "virtually destroy the . . . Indians' ability to practice
their religion," there is nothing to distinguish the road-
building project in *Lyng* from the use of recycled wastewater
on the Peaks. We simply cannot uphold the Plaintiffs' claims
of interference with their faith and, at the same time, remain
faithful to *Lyng*'s dictates.

According to the Plaintiffs, *Lyng* is not controlling in this
RFRA case because the *Lyng* Court refused to apply the *Sher-
bert* test that was expressly adopted in RFRA. Hopi Br. at 40.
In support, the Plaintiffs cite the Supreme Court's statement
in *Smith* that *Lyng* "declined to apply *Sherbert* analysis to the
Government's logging and road construction activities on
lands used for religious purposes by several Native American
Tribes." *Smith*, 494 U.S. at 883. This contention is unpersua-
sive.

"The *Sherbert* analysis" to which the Supreme Court
referred in the quoted sentence from *Smith* is the *Sherbert*
"compelling interest" test. *See id.* (noting that in recent cases,
including *Lyng*, the Court had upheld the application of a
valid and neutral law "regardless of whether it was necessary
to effectuate a compelling interest" under *Sherbert*). But the
*Sherbert* compelling interest test is triggered only when there
is a cognizable burden on the free exercise of religion. *Lyng*
declined to apply the compelling interest test from *Sherbert*,
not because *Lyng* purported to overrule or reject *Sherbert*'s

analysis, but because the burden on the exercise of religion that was present in *Sherbert* was missing in *Lyng*.

The *Lyng* Court held the government's road-building project in that case, unlike in *Sherbert*, did not deny the Plaintiffs "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Lyng*, 485 U.S. at 449. In *Sherbert*, the plaintiff could not get unemployment compensation, available to all other South Carolinians. In *Lyng*, all park users, including the Indians, could use the new road and the lands to which it led. Because the government action did not "burden" the exercise of the Indians' religion, the *Lyng* Court had no occasion to require the government to present a compelling interest for its road-building. Thus, *Lyng* is consistent with the *Sherbert* standard codified in RFRA and forecloses the Plaintiffs' RFRA claims in this case.

Finally, the Supreme Court's pre-*Smith* decision in *Bowen v. Roy*, 476 U.S. 693 (1986), is also on point. In *Bowen*, the parents of an American Indian child brought a Free Exercise Clause challenge to the statutory requirement to obtain a Social Security Number for their daughter in order to receive certain welfare benefits. *Id.* at 695-96. The plaintiffs believed the government's use of a Social Security Number would " 'rob the spirit' of [their] daughter and prevent her from attaining greater spiritual power." *Id.* at 696. The *Bowen* Court rejected the plaintiffs' Free Exercise Clause claims and stated:

> Never to our knowledge has the Court interpreted the First Amendment to require the Government *itself* to behave in ways that the individual believes will further his or her spiritual development or that of his or her family. The Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens. Just as the Government may not insist that [the plaintiffs]

> engage in any set form of religious observance, so [the plaintiffs] may not demand that the Government join in their chosen religious practices by refraining from using a number to identify their daughter. "[T]he Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can extract from the government."

*Id.* at 699-700 (quoting *Sherbert*, 374 U.S. at 412 (Douglas, J., concurring)) (emphasis in original).

The plaintiffs in *Bowen* could not force the government to alter its internal management procedures to identify their daughter by her name, even though they believed the use of a Social Security Number would prevent her from attaining greater spiritual power. It necessarily follows that the Plaintiffs in this case, despite their sincere belief that the use of recycled wastewater on the Peaks will spiritually desecrate a sacred mountain, cannot dictate the decisions that the government makes in managing "what is, after all, *its* land." *See Lyng*, 485 U.S. at 453 (emphasis in original).[15]

---

[15]Our circuit's RFRA jurisprudence is consistent with the Supreme Court's pre-*Smith* precedent examined in this section. In *Guam v. Guerrero*, 290 F.3d 1210 (9th Cir. 2002), we held that a Guam statute criminalizing the importation of marijuana did not substantially burden the practice of Rastafarianism under RFRA, even though "marijuana use is sacramental in the practice of that religion." *Id.* at 1212-13, 1222-23. After noting "RFRA re-establishes the *Sherbert* standard," we defined "substantial burden" as " 'substantial pressure on an adherent to modify his behavior and to violate his beliefs,' including when, if enforced, it 'results in the choice to the individual of either abandoning his religious principle or facing criminal prosecution.' " *Id.* at 1218, 1222 (citation omitted) (quoting *Thomas*, 450 U.S. at 718; *Braunfeld*, 366 U.S. at 605). Applying this test, we held that the Guam statute did not substantially burden Guerrero's free exercise rights, because Rastafarianism does not require the importation, as distinguished from simple possession, of marijuana. *Id.* at 1223.

The dissent contends that our substantial burden standard is inconsistent with *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1997). In *Mockai-*

## C.

For six principal reasons, the Plaintiffs and the dissent would have us depart from the Supreme Court's pre-*Smith* jurisprudence in interpreting RFRA. We decline to do so and will address each of their contentions in turn.

First, the dissent asserts our interpretation of "substantial burden" is inconsistent with the dictionary definition of that term. Dissent at 10086-87. According to the dissent, "[b]ecause Congress did not define 'substantial burden,' either directly or by reference to pre-*Smith* case law, we should define . . . that term according to its ordinary meaning." *Id.* at 10089.

But here, Congress expressly referred to and restored a body of Supreme Court case law that defines what constitutes a substantial burden on the exercise of religion (i.e., *Sherbert*, *Yoder*, and other pre-*Smith* cases). *See* 42 U.S.C. §§ 2000bb(a)(4)-(5); 2000bb(b)(1).[16] Thus, we must look to

_tis_, this court held that state prison officials substantially burden a Catholic priest's religious exercise under RFRA, when the officials intrude into the Sacrament of Penance by recording a confession from an inmate to a priest. *Id.* at 1530-31. *Mockaitis* cannot serve as precedent here for two reasons. First, its holding has been invalidated by the Supreme Court's decision in *City of Boerne*, where the Court found RFRA unconstitutional as applied to the States and their subdivisions. *See City of Boerne*, 521 U.S. at 532, 536. Second, we find *Mockaitis* unhelpful in formulating the substantial burden test. *Mockaitis* did not define substantial burden, let alone analyze the substantial burden standard under the *Sherbert*/*Yoder* framework restored in RFRA, nor did the decision attempt to explain why such framework should not apply to define substantial burden.

[16]The dissent would limit the significance of Congress's citation of *Sherbert* and *Yoder* strictly to the content of what constitutes a compelling interest, not also when that test should be applied. But both *Sherbert* and *Yoder* use the same compelling interest test. If that is all Congress intended by the citation of the two cases, its citation of *Yoder* was redundant and superfluous. We "must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a man-

those cases in interpreting the meaning of "substantial bur-
den." Further, the dissent's approach overlooks a well-
established canon of statutory interpretation. Where a statute
does not expressly define a term of settled meaning, "courts
interpreting the statute must infer, unless the statute otherwise
dictates, that Congress means to incorporate the established
meaning of th[at] ter[m]." *See NLRB v. Town & Country
Elec., Inc.*, 516 U.S. 85, 94 (1995) (citations and internal quo-
tation marks omitted) (alterations in original). Here, Congress
incorporated into RFRA a term of art—substantial burden—
previously used in numerous Supreme Court cases in applying
the Free Exercise Clause. The dissent would have us ignore
this Supreme Court precedent and, instead, invent a new defi-
nition for "substantial burden" by reference to a dictionary.
Dissent at 10086-87. This we cannot do. Rather, we must pre-
sume Congress meant to incorporate into RFRA the definition
of "substantial burden" used by the Supreme Court.

Second, the dissent asserts that our definition of "substan-
tial burden" is "restrictive" and cannot be found in *Sherbert*,
*Yoder*, or any other pre-*Smith* case. Dissent at 10089-93.[17] The

---

ner that renders other provisions of the same statute inconsistent, meaning-
less or superfluous." *Boise Cascade Corp. v. EPA*, 942 F.2d 1427, 1432
(9th Cir. 1991). Hence, we apply the two separate and distinct substantial
burden standards in *Sherbert* and *Yoder* to determine when the compelling
interest test is invoked.

[17]Relatedly, the dissent states "*Sherbert* and *Yoder* used the word 'bur-
den,' but nowhere defined, or even used, the phrase 'substantial burden.' "
Dissent at 10090-91. The dissent is correct that neither *Sherbert* nor *Yoder*
used the precise term "substantial burden." *Sherbert* held that a "burden"
on the free exercise of religion requires the government to show a compel-
ling interest, *Sherbert*, 374 U.S. at 403, and *Yoder* held that an "undu[e]
burden[ ]" on the free exercise of religion does the same, *Yoder*, 406 U.S.
at 220. For our purposes, however, this distinction is immaterial. Later
Supreme Court cases have cited *Yoder* and other pre-*Smith* decisions for
the proposition that only a "substantial burden" on the free exercise of reli-
gion triggers the compelling interest test. *See Hernandez*, 490 U.S. at 699
(noting the "free exercise inquiry asks whether government has placed a

dissent contends it is "clear that RFRA protects against burdens that, while imposed by a different mechanism than those in *Sherbert* and *Yoder*, are also 'substantial.' " *Id.* at 10093.

[9] For this purportedly "clear" proposition, the dissent cites no authority. That is, the dissent cannot point to a single Supreme Court case where the Court found a substantial burden on the free exercise of religion outside the *Sherbert/Yoder* framework. The reason is simple: There is none. In the pre-*Smith* cases adopted in RFRA, the Supreme Court has found a substantial burden on the exercise of religion *only* when the burden fell within the *Sherbert/Yoder* framework. *See Sherbert*, 374 U.S. at 403-06; *Yoder*, 406 U.S. at 207, 220; *Thomas*, 450 U.S. at 717-18 (applying *Sherbert*); *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 140-45 (1987) (applying *Sherbert*); *Frazee v. Ill. Dep't. of Employment Sec.*, 489 U.S. 829, 832-35 (1989) (applying *Sherbert*). Because Congress expressly restored pre-*Smith* cases in RFRA, we cannot conclude RFRA's "substantial burden" standard expands beyond the pre-*Smith* cases to cover government actions never recognized by the Supreme Court to constitute a substantial burden on religious exercise.[18]

---

substantial burden" on the exercise of religion "and, if so, whether a compelling governmental interest justifies the burden" (citing *Yoder* and other pre-*Smith* decisions)); *see also Jimmy Swaggart Ministries v. Bd. of Equalization of Cal.*, 493 U.S. 378, 384-85 (1990). Where the Supreme Court has equated the content of "substantial burden" to "burden" and "undue burden," we must do the same.

[18]For the same reason, the dissent is incorrect in its assertion that "[h]ad Congress wished to establish the standard employed by the majority, it could easily have stated that 'Government shall not, *through the imposition of a penalty or denial of a benefit*, substantially burden a person's exercise of religion.' " *See* Dissent at 10087 (emphasis in original). The addition of the italicized text would have been superfluous, because the cases Congress restored in RFRA recognize a substantial burden on the exercise of religion only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*).

Third, the Plaintiffs assert RFRA's compelling interest test includes a "least restrictive means" requirement, which " 'was not used in the pre-*Smith* jurisprudence RFRA purported to codify.' " Hopi Br. at 31 (quoting *City of Boerne*, 521 U.S. at 535); *see also* Dissent at 10083. The Plaintiffs note that, whereas the government must establish only a compelling interest to withstand a Free Exercise Clause challenge, the government must establish both a compelling interest *and* the least restrictive means to withstand a RFRA challenge. That is true enough, but it puts the cart before the horse. The additional statutory requirement of a least restrictive means is triggered only by a finding that a substantial burden exists; that is the sole and threshold issue in this case. Absent a substantial burden, the government need not establish a compelling interest, much less prove it has adopted the least restrictive means.

Fourth, the Plaintiffs contend RFRA goes beyond the constitutional language that "forbids the 'prohibiting' of the free exercise of religion and uses the broader verb 'burden': a government may burden religion only on the terms set out by the new statute." Hopi Br. at 31-32 (quoting *United States v. Bauer*, 84 F.3d 1549, 1558 (9th Cir. 1996)); *see also* Dissent at 10083. This contention ignores the Supreme Court's repeated practice of concluding a government action "prohibits" the free exercise of religion by determining whether the action places a "burden" on the exercise of religion.[19] Thus, the difference in the language of the Free Exercise Clause ("prohibit") and the language of RFRA ("burden") does not affect what constitutes a "burden" on the exercise of religion, under the very cases cited by RFRA as embodying the congressionally desired rule of decision.

---

[19]*See Yoder*, 406 U.S. at 220 ("A regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement for governmental neutrality if it unduly *burdens* the free exercise of religion." (emphasis added)); *Sherbert*, 374 U.S. at 403 ("We turn first to the question whether the disqualification for benefits imposes any *burden* on the free exercise of appellant's religion." (emphasis added)).

Fifth, the Plaintiffs assert Congress expanded RFRA's definition of "exercise of religion" with the enactment of the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc *et seq.* Navajo Br. at 29; *see also* Dissent at 10083-84. Prior to RLUIPA's enactment, "exercise of religion" under RFRA meant "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb-2(4) (1994). The Free Exercise Clause of the First Amendment protects only "the observation of a *central* religious belief or practice." *Hernandez*, 490 U.S. at 699 (emphasis added).[20] RLUIPA, however, amended RFRA's definition of "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4); 42 U.S.C. § 2000cc-5(7)(A).

The Plaintiffs' assertion conflates two distinct questions under RFRA: (1) what constitutes an "exercise of religion" and (2) what amounts to a "substantial burden" on the exercise of that religion. The first question, that the Plaintiffs' activities are an "exercise of religion," is undisputed in this case. Of course, that question has no bearing on the second, "substantial burden," question. RFRA's amended definition of "exercise of religion" merely expands the scope of what may not be substantially burdened from "central tenets" of a religion to "any exercise of religion." It does not change what level or kind of interference constitutes a "substantial burden" upon such religious exercise.

---

[20]Nevertheless, the *Hernandez* Court also cautioned: "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith." *Hernandez*, 490 U.S. at 699; *see also Smith*, 494 U.S. at 887 ("What principle of law or logic can be brought to bear to contradict a believer's assertion that a particular act is 'central' to his personal faith?"). In light of the Supreme Court's disapproval of "the centrality test," we have held the sincerity of a religious belief, not its centrality to a faith, determines whether the Free Exercise Clause applies. *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

Finally, the dissent attempts to justify its expansive interpretation of RFRA on the basis that RFRA applies "in all cases" where the free exercise of religion is burdened, whereas pre-*Smith* jurisprudence excluded entire classes of cases from scrutiny under the compelling interest test, e.g., prison and military regulations. Dissent at 10084. But no one disputes that RFRA applies here; it is not an issue. That RFRA applies to classes of cases in which the First Amendment's compelling interest test is inapplicable is irrelevant. This observation does not define what constitutes a "substantial burden" and, therefore, does not speak to the threshold question whether a "substantial burden" exists.

In sum, Congress's statutory command in RFRA to restore the Supreme Court's pre-*Smith* jurisprudence is crystal clear, and neither the dissent nor the Plaintiffs have offered any valid reason for departing from that jurisprudence in interpreting RFRA.

## D.

**[10]** In support of their RFRA claims, the Plaintiffs rely on two of our RLUIPA decisions. For two reasons, RLUIPA is inapplicable to this case. First, RLUIPA, by its terms, prohibits only state and local governments from applying regulations that govern land use or institutionalized persons to impose a "substantial burden" on the exercise of religion. *See* 42 U.S.C. §§ 2000cc; 2000cc-1; 2000cc-5(4)(A). Subject to two exceptions not relevant here,[21] RLUIPA does not apply to a federal government action, which is the only issue in this case. *See id.* § 2000cc-5(4). Second, even for state and local governments, RLUIPA applies only to government land-use regulations of private land—such as zoning laws—not to the government's management of its own land. *See id.* § 2000cc-

---

[21]Sections 2000cc-2(b) (burden of persuasion) and 2000cc-3 (rules of construction) apply also to the federal government. *See* 42 U.S.C. § 2000cc-5(4)(B).

5(5).[22] Nonetheless, even were we to assume the same "substantial burden" standard applies in RLUIPA and RFRA actions, the two RLUIPA cases cited by the Plaintiffs do not support their RFRA claims.[23]

First, in *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005), an American Indian inmate brought a RLUIPA challenge against a prison policy requiring all male inmates to maintain their hair no longer than three inches. *Id.* at 991-92. Warsoldier refused to comply with the policy because of his "sincere religious belief that he may cut his hair only upon the death of a loved one," and was punished by confinement to his cell, the imposition of additional duty hours, and revocation of certain privileges. *Id.* at 991-92. We held the prison policy imposed a substantial burden on Warsoldier's exercise of his religion because it coerced him to violate his religious beliefs under the threat of punishment. *Id.* at 995-96.

*Warsoldier* is a straightforward application of the Supreme Court's decisions in *Sherbert* and *Yoder*. As in *Sherbert* and *Yoder*, Warsoldier was coerced to act contrary to his religious beliefs by the threat of sanctions (i.e., confinement to his cell and the imposition of additional duty hours), and forced to choose between following the tenets of his religion and receiving a governmental benefit (i.e., by the revocation of certain privileges in prison). In contrast, and as analyzed above, the Plaintiffs in this case cannot show the use of recycled wastewater coerces them to violate their religious beliefs under the threat of sanctions, or conditions a government benefit upon conduct that would violate their religious beliefs.

---

[22]RLUIPA defines a "land use regulation" as "a *zoning or landmarking law* . . . that limits or restricts a claimant's use or development of land . . ., *if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land.*" 42 U.S.C. § 2000cc-5(5) (emphasis added).

[23]Because RLUIPA is inapplicable to this case, we express no opinion as to the standards to be applied in RLUIPA actions.

Second, the Plaintiffs rely on our statement in *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024 (9th Cir. 2004), that, under RLUIPA, a "substantial burden" on a religious exercise must be "a significantly great restriction or onus upon such exercise." *Id.* at 1034. The Plaintiffs contend the use of recycled wastewater on the Peaks imposes a "significantly great restriction or onus" on the exercise of their religion.

**[11]** *San Jose Christian College*'s statement of the "substantial burden" test does not support the Plaintiffs' RFRA claims in this case. That "substantial burden" means a "significantly great restriction or onus" says nothing about what kind or level of restriction is "significantly great."**[24]** Instead, the "substantial burden" question must be answered by reference

---

**[24]**The RLUIPA case cited by the dissent, *Shakur*, 514 F.3d 878, is not to the contrary. Dissent at 10094, 10099-10101. In *Shakur*, we held that a triable issue of fact existed as to whether prison officials' denial of Halal meat to Shakur, a Muslim inmate, imposed a "substantial burden" on his religious exercise. *Shakur*, 514 F.3d at 888-89. The prison offered Kosher meat meals to Jewish inmates, but denied Halal meat meals to Shakur. *Id.* at 883, 891. The alternative, vegetarian diet exacerbated Shakur's hiatal hernia and caused excessive gas that "interfere[d] with the ritual purity *required* for his Islamic worship." *Id.* at 888 (emphasis added). Contrary to the dissent's assertions, Dissent at 10099-10100, both meal choices provided to Shakur in prison were "unacceptable" to his religion—the non-Halal meat meals were forbidden by his religion and the Halal vegetarian meals interfered with the ritual purity required for his religious activities. *Shakur*, 514 F.3d at 889 (internal quotation marks omitted). Like the Seventh-day Adventist in *Sherbert*, who could obtain unemployment benefits only by working on Saturdays and thereby violating her religious tenets, Shakur could have a meal in prison and avoid starvation only if he violated his religious beliefs. Relying on *Sherbert* and *Thomas*, we held that there was a triable issue of fact as to whether the prison policy imposed a substantial burden on Shakur's religious exercise, because the policy conditioned a governmental benefit to which Shakur was otherwise entitled—a meal in prison—upon conduct that would violate Shakur's religious beliefs. *Id.* Thus, *Shakur* is a straightforward application of the *Sherbert* test and is consistent with the substantial burden standard we adopt today.

to the Supreme Court's pre-*Smith* jurisprudence, including *Sherbert* and *Yoder*, that RFRA expressly adopted. Under that precedent, the Plaintiffs have failed to show a "substantial burden" on the exercise of their religion, and thus failed to establish a prima facie RFRA claim. Accordingly, we affirm the district court's entry of judgment for the Defendants on the RFRA claim.[25]

## IV.   National Environmental Policy Act of 1969

Plaintiffs contend the district court erred in granting summary judgment to the Defendants on five claims under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq*. We adopt the parts of the original three-judge panel opinion affirming the district court's grant of summary judgment to the Defendants on the following four NEPA claims: (1) the Final Environmental Impact Statement

---

[25]As a last resort, the dissent invokes provocative soundbites, accusing us of "effectively read[ing] American Indians out of RFRA." Dissent at 10137. The dissent contends "the strength of the Indians' argument in this case could be seen more easily by the majority if another religion were at issue." *Id.* at 10105. In support, the dissent notes the use of artificial snow on the Peaks is no different than the government "permitt[ing] only" baptismal water contaminated with recycled wastewater for Christians or "permitt[ing] only" non-Kosher food for Orthodox Jews. *Id.* at 10105-06.

Putting aside the Equal Protection Clause violation that may arise from a law targeting only Christians or only Jews, the dissent's examples are clearly distinguishable. When a law "permits only" recycled wastewater to carry out baptisms or "permits only" non-Kosher food for Orthodox Jews, the government compels religious adherents to engage in activities repugnant to their religious beliefs under the penalty of sanctions. Such government compulsion is specifically prohibited by the Supreme Court's decision in *Yoder*. A law permitting Indians to use only recycled wastewater in their religious or healing ceremonies would likewise constitute a substantial burden on their religious exercise. But there is no such law in this case. When the government allows the use of recycled wastewater on a ski area, it does not compel the Plaintiffs to act contrary to their religious tenets. The Plaintiffs remain free to use natural water in their religious or healing ceremonies and otherwise practice their religion using whatever resources they may choose.

("FEIS") failed to consider a reasonable range of alternatives to the use of recycled wastewater; (2) the FEIS failed to discuss and consider the scientific viewpoint of Dr. Paul Torrence; (3) the FEIS failed adequately to consider the environmental impact of diverting the recycled wastewater from Flagstaff's regional aquifer; and (4) the FEIS failed adequately to consider the social and cultural impacts of the Snowbowl upgrades on the Hopi people. *See Navajo Nation*, 479 F.3d at 1054-59.

The remaining NEPA claim, which is raised only by the Navajo Plaintiffs, is that the FEIS failed adequately to consider the risks posed by human ingestion of artificial snow. The Navajo Plaintiffs' complaint did not include this NEPA claim or the factual allegations upon which the claim rests. The Navajo Plaintiffs raised this claim for the first time in their motion for summary judgment. In their opposition to the Navajo Plaintiffs' summary judgment motion, the Defendants contended the Navajo Plaintiffs had failed to raise this NEPA claim in their complaint. In response, the Navajo Plaintiffs moved to amend their complaint to add a distinct and new NEPA cause of action claiming for the first time that the FEIS failed to consider the risks posed by human ingestion of artificial snow. The district court denied the Navajo Plaintiffs' motion to amend and did not address this NEPA claim on the merits. *Navajo Nation*, 408 F. Supp. 2d at 908. The Navajo Plaintiffs failed to appeal the district court's denial of their motion to amend, and therefore, the district court's denial of said motion is not before us.

Further, on this appeal, the Navajo Plaintiffs do not explain why their complaint is otherwise sufficient to state this NEPA claim—despite the Defendants' assertions that the Navajo Plaintiffs failed to plead this NEPA claim.[26] Indeed, the Nav-

---

[26]The dissent quotes a sentence from the Navajo Plaintiffs' reply brief that cursorily states this NEPA claim was " 'properly pled' " in the district court. Dissent at 10130 (quoting Navajo Reply Br. at 23). Nevertheless,

ajo Plaintiffs concede "the specific allegations at issue were not included" in their complaint. Navajo Reply Br. at 23-24. Rather, the Navajo Plaintiffs assert this NEPA claim was adequately presented to the district court because the claim "was briefed at summary judgment by all parties and presented at oral argument [to the district court]." *Id.* at 24. Nevertheless, our precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such claim in a summary judgment motion is insufficient to present the claim to the district court. *See, e.g.*, *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) (" 'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.' "); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006) (holding that the complaint did not satisfy the notice pleading requirements of Federal Rule of Civil Procedure 8(a) because the complaint "gave the [defendants] no notice of the specific factual allegations presented for the first time in [the plaintiff's] opposition to summary judgment").[27] Because the Navajo Plaintiffs failed sufficiently to present this NEPA claim to the district court and also failed

the Navajo Plaintiffs' reply brief does not state what words in the complaint are sufficient to plead this NEPA claim, nor does the brief cite any case or rule that makes it so. It is well-established that a bare assertion in an appellate brief, with no supporting argument, is insufficient to preserve a claim on appeal. *See Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 n.1 (9th Cir. 2008). The dissent's advocacy of why the Navajo Plaintiffs' complaint satisfies the notice pleading requirements of Federal Rule of Civil Procedure 8(a) is the dissent's own invention and disregards the rule that we do not manufacture arguments for an appellant. *See id.*

[27]The dissent notes that the Navajo Plaintiffs raised the issue of human ingestion of artificial snow during the preparation of the FEIS and in the administrative appeal. Dissent at 10127-29. This, of course, is irrelevant to the question whether this claim was presented to the *district court*. A party may raise a claim at the administrative proceedings, but forego that claim on judicial review. Further, presenting a claim during the administrative proceedings does not put the defendants on notice that such claim will also be raised before the district court.

to appeal the district court's denial of their motion to amend the complaint to add this NEPA claim, the claim is waived on appeal. *See O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1063 n.3 (9th Cir. 2007).

**[12]** Accordingly, we affirm the district court's grant of summary judgment to the Defendants on all NEPA claims.

## V.   National Historic Preservation Act

**[13]** Finally, the Plaintiffs contend the district court erred in granting summary judgment to the Defendants on their claim under the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.* We adopt the part of the original three-judge panel opinion affirming the district court's grant of summary judgment to the Defendants on the NHPA claim. *See Navajo Nation*, 479 F.3d at 1059-60.

## VI.   Conclusion

We affirm the district court's entry of judgment in favor of the Defendants on the RFRA claim, and the district court's grant of summary judgment to the Defendants on the NEPA and the NHPA claims.

**AFFIRMED.**

**Volume 2 of 2**

W. FLETCHER, Circuit Judge, dissenting, joined by Judge Pregerson and Judge Fisher:

The en banc majority today holds that using treated sewage effluent to make artificial snow on the most sacred mountain of southwestern Indian tribes does not violate the Religious Freedom Restoration Act ("RFRA"). It also holds that a supposed pleading mistake prevents the tribes from arguing under the National Environmental Protection Act ("NEPA") that the Forest Service failed to consider the likelihood that children and others would ingest snow made from the effluent. I dissent from both holdings.

### I.    Religious Freedom Restoration Act

[D]ivers great learned men have been heretical, whilst they have sought to fly up to the secrets of the Deity by the waxen wings of the senses.

-    Sir Francis Bacon, *Of the Proficience and Advancement of Learning, Divine and Human* (Book I, 1605).

The majority holds that spraying 1.5 million gallons per day of treated sewage effluent on the most sacred mountain of southwestern Indian tribes does not "substantially burden" their "exercise of religion" in violation of RFRA. According to the majority, "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies . . . would be physically affected" by the use of the treated sewage effluent. Maj. op. at 10041. According to the majority, the "sole effect" of the dumping of the treated sewage effluent is on the Indians' "subjective spiritual experience." *Id.* at 10041. The majority holds:

> [T]he presence of the artificial snow on the Peaks is offensive to the Plaintiffs' mental and emotional feelings about their religion and will decrease the

spiritual fulfillment Plaintiffs get from practicing their religion on the mountain. Nevertheless, a government action that decreases the spirituality, the fervor, or the satisfaction with which a believer practices his religion is not what Congress has labeled a "substantial burden" . . . on the free exercise of religion. Where, as here, there is no showing the government has coerced the Plaintiffs to act contrary to their religious beliefs under the threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs, there is no "substantial burden" on the exercise of their religion.

*Id.* In so holding, the majority misstates the evidence below, misstates the law under RFRA, and misunderstands the very nature of religion.

## A.   Background

The San Francisco Peaks in northern Arizona have long-standing religious significance to numerous Indian tribes of the American Southwest. Humphrey's Peak, Agassiz Peak, Doyle Peak, and Fremont Peak form a single large mountain commonly known as the San Francisco Peaks, or simply the Peaks. Humphrey's Peak is the highest point in Arizona.

The Peaks lie within the 1.8 million acres of the Coconino National Forest. In 1984, Congress designated 18,960 acres of the Peaks as the Kachina Peaks Wilderness. The Forest Service has identified the Peaks as eligible for inclusion in the National Register of Historic Places and as a "traditional cultural property." The Service has described the Peaks as "a landmark upon the horizon, as viewed from the traditional or ancestral lands of the Hopi, Zuni, Acoma, Navajo, Apache, Yavapai, Hualapai, Havasupai, and Paiute."

The Forest Service has acknowledged that the Peaks are sacred to at least thirteen formally recognized Indian tribes,

and that this religious significance is of centuries' duration. There are differences among these tribes' religious beliefs and practices associated with the Peaks, but there are important commonalities. As the Service has noted, many of the tribes share beliefs that water, soil, plants, and animals from the Peaks have spiritual and medicinal properties; that the Peaks and everything on them form an indivisible living entity; that the Peaks are home to deities and other spirit beings; that tribal members can communicate with higher powers through prayers and songs focused on the Peaks; and that the tribes have a duty to protect the Peaks.

The Arizona Snowbowl is a ski area on Humphrey's Peak, the most sacred of the San Francisco Peaks. Organized skiing has existed at the Arizona Snowbowl since 1938. In 1977, the then-owner of the Snowbowl requested authorization to clear 120 acres of new ski runs and to do other development. In 1979, after preparing an Environmental Impact Statement, the Forest Service authorized the clearing of 50 of the 120 requested acres, the construction of a new lodge, and some additional development. An association of Navajo medicine men, the Hopi tribe, and two nearby ranch owners brought suit under, *inter alia*, the Free Exercise Clause of the First Amendment and NEPA. The D.C. Circuit upheld the Forest Service's decision. *Wilson v. Block*, 708 F.2d 735 (D.C. Cir. 1983). In *Wilson*, the court applied only the First Amendment, for RFRA did not yet exist. The then-proposed expansion of the Snowbowl did not involve any use of treated sewage effluent.

Until now, the Snowbowl has always depended on natural snowfall. In dry years, the operating season is short, with few skiable days and few skiers. The driest year in recent memory was 2001-02, when there were 87 inches of snow, 4 skiable days, and 2,857 skiers. Another dry year was 1995-96, when there were 113 inches of snow, 25 skiable days, and 20,312 skiers. By contrast, in wet years, there are many skiable days and many skiers. For example, in 1991-92, there were 360

inches of snow, 134 skiable days, and 173,000 skiers; in 1992-93, there were 460 inches of snow, 130 skiable days, and 180,062 skiers; in 1997-98, there were 330 inches of snow, 115 skiable days, and 173,862 skiers; and in 2004-05, there were 460 inches of snow, 139 skiable days, and 191,317 skiers.

ASR, the current owner, purchased the Snowbowl in 1992 for $4 million, with full knowledge of weather conditions in northern Arizona. In September 2002, ASR submitted a development proposal to the Forest Service. In February 2005, the Forest Service issued a Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD"). The ROD approved the development alternative preferred by ASR, which included a proposal to make artificial snow using treated sewage effluent.

Under the alternative approved in the ROD, the City of Flagstaff would provide the Snowbowl with up to 1.5 million gallons per day of its treated sewage effluent — euphemistically called "reclaimed water" — from November through February. A 14.8-mile pipeline would be built between Flagstaff and the Snowbowl to carry the treated effluent. The Snowbowl would be the first ski resort in the nation to make artificial snow entirely from undiluted treated sewage effluent.

Before treatment, raw sewage consists of waste discharged into Flagstaff's sewers by households, businesses, hospitals, and industries. The FEIS describes the treatment performed by Flagstaff:

> In the primary treatment stage, solids settle out as sludge . . . . Scum and odors are also removed . . . . Wastewater is then gravity-fed for secondary treatment through the aeration/denitrification process, where biological digestion of waste occurs . . . . in which a two-stage anoxic/aerobic process removes

nitrogen, suspended solids, and [digestible organic matter] from the wastewater. The secondary clarifiers remove the by-products generated by this biological process, recycle microorganisms back into the process from return activated sludge, and separate the solids from the waste system. The waste sludge is sent to [a different plant] for treatment. The water for reuse then passes through the final sand and anthracite filters prior to disinfection by ultraviolet light radiation. . . . Water supplied for reuse is further treated with a hypochlorite solution to assure that residual disinfection is maintained . . . .

The effluent that emerges after treatment by Flagstaff satisfies the requirements of Arizona law for "reclaimed water." However, as the FEIS explains, the treatment does not produce pure water:

Fecal coliform bacteria, which are used as an indicator of microbial pathogens, are typically found at concentrations ranging from $10^5$ to $10^7$ colony-forming units per 100 milliliters (CFU/100 ml) in untreated wastewater. Advanced wastewater treatment may remove as much as 99.9999+ percent of the fecal coliform bacteria; however, the resulting effluent has detectable levels of enteric bacteria, viruses, and protazoa, including Cryptosporidium and Giardia.

Under Arizona law, the treated sewage effluent must be free of "detectable fecal coliform organisms" in only "four of the last seven daily reclaimed water samples." Ariz. Admin. Code § R18-11-303(B)(2)(a). The FEIS acknowledges that the treated sewage effluent also contains "many unidentified and unregulated residual organic contaminants." Treated sewage effluent may be used for many things, including irrigation and flushing toilets, but the Arizona Department of Environ-

mental Quality ("ADEQ") requires that precautions be taken to avoid ingestion by humans.

Under the alternative approved in the ROD, treated sewage effluent would be sprayed on 205.3 acres of Humphrey's Peak during the ski season. In November and December, the Snowbowl would use the effluent to build a base layer of artificial snow. The Snowbowl would then make more snow from the effluent depending on the amount of natural snowfall. The Snowbowl would also construct a reservoir on the mountain with a surface area of 1.9 acres to hold treated sewage effluent. The stored effluent would allow snowmaking to continue after Flagstaff cuts off the supply at the end of February.

## B.   Religious Freedom Restoration Act

Under the Religious Freedom Restoration Act of 1993 ("RFRA"), the federal government may not "substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." 42 U.S.C. § 2000bb-1(a). "Exercise of religion" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Subsection (b) of § 2000bb-1 provides, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."

These provisions of RFRA were prompted by two Supreme Court decisions. RFRA was originally adopted in response to *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990). In *Smith*, an Oregon statute denied unemployment benefits to drug users, including Indians who used peyote in religious ceremonies. *Id.* at 890. The Court held that the Free Exercise Clause of the First

Amendment does not prohibit burdens on religious practices if they are imposed by laws of general applicability such as the Oregon statute. Characterizing its prior cases striking down generally applicable laws as "hybrid" decisions invoking multiple constitutional interests, the Court refused to subject facially neutral regulations to strict scrutiny when challenged solely under the First Amendment. *Id.* at 881-82, 885-86. However, the Court acknowledged that although the Constitution does not require a "compelling government interest" test in such a case, Congress could impose one. *Id.* at 890.

In RFRA, enacted three years later, Congress made formal findings that the Court's decision in *Smith* "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," and that "the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests." Pub. L. No. 103-141, § 2(a), 107 Stat. 1488, 1488 (1993) (codified at 42 U.S.C. § 2000bb(a)). Congress declared that the purposes of RFRA were "to provide a claim or defense to persons whose religious exercise is substantially burdened by government" and "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened." *Id.* § 2(b), 107 Stat. at 1488 (codified at 42 U.S.C. § 2000bb(b)). In this initial version of RFRA, adopted in 1993, Congress defined "exercise of religion" as "exercise of religion under the First Amendment to the Constitution." *Id.* § 5, 107 Stat. at 1489 (codified at 42 U.S.C. § 2000bb-2(4) (1994) (repealed)).

In 1997, in *City of Boerne v. Flores*, 521 U.S. 507 (1997), the Supreme Court held RFRA unconstitutional as applied to state and local governments because it exceeded Congress's authority under § 5 of the Fourteenth Amendment. *Id.* at 529,

534-35. The Court did not, however, invalidate RFRA as applied to the federal government. *See Guam v. Guerrero*, 290 F.3d 1210, 1220-21 (9th Cir. 2002). Three years later, in response to *City of Boerne*, Congress enacted the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"). Pub. L. No. 106-274, 114 Stat. 803 (codified at 42 U.S.C. §§ 2000cc *et seq.*). RLUIPA replaced RFRA's original First Amendment definition of "exercise of religion" with the broader statutory definition quoted above. RLUIPA §§ 7-8, 114 Stat. at 806-07. Under RFRA after its amendment by RLUIPA, "exercise of religion" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000bb-2(4), 2000cc-5(7)(A).

In several ways, RFRA provides greater protection for religious practices than did the Supreme Court's pre-*Smith* cases, which were based solely on the First Amendment. First, RFRA "goes beyond the constitutional language that forbids the 'prohibiting' of the free exercise of religion and uses the broader verb 'burden.' " *United States v. Bauer*, 84 F.3d 1549, 1558 (9th Cir. 1996) (as amended). *Cf.* U.S. Const. amend. 1 ("Congress shall make no law . . . prohibiting the free exercise [of religion]."); *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 451 (1988) ("The crucial word in the constitutional text is 'prohibit' . . . .").

Second, as the Supreme Court noted in *City of Boerne*, RFRA provides greater protection than did the First Amendment under the pre-*Smith* cases because "the Act imposes in every case a least restrictive means requirement — a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify." 521 U.S. at 535.

Third, in passing RLUIPA in 2000, Congress amended RFRA's definition of "exercise of religion." Under the amended definition — "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"

— RFRA now protects a broader range of conduct than was protected under the Supreme Court's interpretation of "exercise of religion" under the First Amendment. *See Guru Nanak Sikh Soc'y v. County of Sutter*, 456 F.3d 978, 995 n.21 (9th Cir. 2006) (noting same). After 2000, RFRA plaintiffs must still prove that the burden on their religious exercise is "substantial," but the difficulty of showing a substantial burden is decreased because a broader range of religious exercise is now protected under RFRA. That is, some governmental actions were not previously considered burdens because they burdened non-protected religious exercise. Given the new broader definition of statutorily protected "exercise of religion," those actions have now become burdens within the meaning of RFRA.

Finally, and perhaps most important, RFRA provides broader protection because it applies *Sherbert* and *Yoder*'s compelling interest test "in all cases" where the exercise of religion is substantially burdened. 42 U.S.C. § 2000bb(b). Prior to *Smith*, the Court had refused to apply the compelling interest analysis in various contexts, exempting entire classes of free exercise cases from such heightened scrutiny. *See, e.g.*, *Lyng*, 485 U.S. at 454; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987); *Goldman v. Weinberger*, 475 U.S. 503, 507-08 (1986); *see also Smith*, 494 U.S. at 883 ("In recent years, we have abstained from applying the *Sherbert* test (outside the unemployment compensation field) at all."). RFRA rejected the categorical barriers to strict scrutiny employed in those cases.

C.   The Majority's Misstatements of the Law under RFRA

The majority misstates the law under RFRA in three ways. First, it concludes that a "substantial burden" on the "exercise of religion" under RFRA occurs only when the government "has coerced the Plaintiffs to act contrary to their religious beliefs under threat of sanctions, or conditioned a governmental benefit upon conduct that would violate the Plaintiffs' reli-

gious beliefs." Maj. op. at 10042. Second, it ignores the impact of RLUIPA, and cases interpreting RLUIPA, on the definition of a "substantial burden" on the "exercise of religion" in RFRA. Third, it treats as an open question whether RFRA applies to the federal government's use of its own land. I discuss these misstatements in turn.

### 1. Definition of "Substantial Burden"

Neither RFRA nor RLUIPA defines "substantial burden."[1] RFRA states,

The purposes of [RFRA] are —

(1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and

(2) to provide a claim or defense to persons whose religious freedom is substantially burdened by government.

42 U.S.C. § 2000bb(b). The majority uses this statutory text to conclude that the purpose of RFRA was to "restore" a de facto "substantial burden" test supposedly employed in *Sherbert* and *Yoder*. In the hands of the majority, that test is extremely restrictive, allowing a finding of "substantial burden" only in those cases where the burden is imposed by the same mechanisms as in those two cases. In the majority's words, "Where . . . there is no showing the government has coerced the Plaintiffs to act contrary to their religious beliefs under threat of sanctions, or conditioned a governmental ben-

---

[1]Although the majority opinion uses the noun phrase "substantial burden," RFRA employs the verb phrase "substantially burden." Because the distinction is not material, I use the terms interchangeably.

efit upon conduct that would violate the Plaintiffs' religious beliefs, there is no 'substantial burden' on the exercise of their religion." Maj. op. at 10042.

For six reasons, the majority is wrong in looking to *Sherbert* and *Yoder* for an exhaustive definition of what constitutes a "substantial burden." First, the majority's approach is inconsistent with the plain meaning of the phrase "substantial burden." Second, RFRA does not incorporate any pre-RFRA definition of "substantial burden." Third, even if RFRA did incorporate a pre-RFRA definition of "substantial burden," *Sherbert*, *Yoder*, and other pre-RFRA Supreme Court cases did not use the term in the restrictive manner employed by the majority. That is, the cases on which the majority relies did not state that interferences with the exercise of religion constituted a "substantial burden" only when imposed through the two mechanisms used in *Sherbert* and *Yoder*. Fourth, the purpose of RFRA was to expand rather than to contract protection for the exercise of religion. If a disruption of religious practices can qualify as a "substantial burden" under RFRA only when it is imposed by the same mechanisms as in *Sherbert* and *Yoder,* RFRA would permit interferences with religion that it was surely intended to prevent. Fifth, the majority's approach overrules fourteen years of contrary circuit precedent. Sixth, the majority's approach is inconsistent with our cases applying RLUIPA. The Supreme Court has instructed us that RLUIPA employs the same analytic framework and standard as RFRA. I consider these reasons in turn.

### a.   Substantial Burden on the Exercise of Religion

The majority contends that the phrase "substantial burden" refers only to burdens that are created by two mechanisms — the imposition of a penalty, or the denial of a government benefit. But the phrase "substantial burden" has a plain and ordinary meaning that does not depend on the presence of a penalty or deprivation of benefit. A "burden" is "[s]omething that hinders or oppresses." Black's Law Dictionary (8th ed.

2004). A burden is "substantial" if it is "[c]onsiderable in importance, value, degree, amount, or extent." American Heritage Dictionary (4th ed. 2000). In RFRA, the phrase "substantial burden" modifies the phrase "exercise of religion." Thus, RFRA prohibits government action that "hinders or oppresses" the exercise of religion "to a considerable degree." *See also San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir. 2004) (using dictionary definitions to define "substantial burden" under RLUIPA and concluding that "for a land use regulation to impose a 'substantial burden' it must be 'oppressive' to a 'significantly great' extent.").

The text of RFRA does not describe a particular *mechanism* by which religion cannot be burdened. Rather, RFRA prohibits government action with a particular *effect* on religious exercise. This prohibition is categorical: "Government shall not substantially burden a person's exercise of religion . . . ." 42 U.S.C. § 2000bb-1(a). Had Congress wished to establish the standard employed by the majority, it could easily have stated that "Government shall not, *through the imposition of a penalty or denial of a benefit*, substantially burden a person's exercise of religion . . . ." It did not do so. The majority is correct that such text would have been unnecessary if RFRA had incorporated previous Supreme Court case law that defined the phrase "substantial burden" as a term of art referring only to the imposition of a penalty or denial of a benefit. Maj. op. at 10061-62. However, as explained below, Congress did not "restore" any technical definition of "substantial burden" found in pre-RFRA case law, let alone "restore" the definition the majority now reads into RFRA.

### b. "Restoring" *Sherbert* and *Yoder*

The text of RFRA explicitly states that the purpose of the statute is "to restore the *compelling interest test* as set forth in [*Sherbert* and *Yoder*]." 42 U.S.C. § 2000bb(b) (emphasis added). The text refers separately to "substantially burden"

and the "exercise of religion," but it says nothing about "restoring" the definition of these terms as used in *Sherbert* and *Yoder*.

In the years after *Sherbert* and *Yoder*, the Supreme Court applied the "compelling interest test" to fewer and fewer Free Exercise claims under the First Amendment. For example, in *Goldman,* 475 U.S. at 505, 507-08, the Court conceded that a military regulation banning civilian "headgear" implicated the First Amendment rights of an Orthodox Jew who sought to wear a yarmulke, but then upheld the regulation after minimal scrutiny due to the "great deference [owed] the professional judgment of military authorities concerning the relative importance of a particular military interest." In *O'Lone*, 482 U.S. at 349, the Court refused to require that prison regulations be justified by a compelling interest, instead demanding only that they be "reasonably related to legitimate penological interests." *See also Bowen v. Roy*, 476 U.S. 693, 707 (1986) (Burger, J., for plurality) (compelling interest test not applicable in enforcing "facially neutral and uniformly applicable requirement for the administration of welfare programs"); *Lyng*, 485 U.S. at 454 (compelling interest test not applicable where government interferes with religious exercise through "the use of its own land").

In other cases, the Court purported to apply the compelling interest test, but in fact applied a watered-down version of the scrutiny employed in *Sherbert* and *Yoder*. Rather than demanding, as it had in *Sherbert* and *Yoder,* that the particular governmental interest at stake be compelling, the Court accepted extremely general definitions of the government's interest. For example, in *United States v. Lee*, 455 U.S. 252 (1982), the Court balanced an individual's interest in a religious exemption from social security taxes against the "broad public interest in maintaining a sound tax system." *Id.* at 260. Likewise, the plurality in *Roy* balanced an individual's objection to the provision of a social security number against the government's general interest in "preventing fraud in [govern-

ment] benefits programs." 476 U.S. at 709; *see also* David B. Tillotson, *Free Exercise in the 1980s: A Rollback of Protections*, 24 U.S.F. L. Rev. 505, 520 (1990) ("The Court has either defined the Government's interest so broadly that no individual's interest could possibly outweigh it or, more recently, has . . . simply refused to weigh individual challenges to uniformly applicable and neutral statutes against any government interest, notwithstanding *Sherbert*.").

*Smith*, in which the Court refused to apply the compelling governmental interest test to a generally applicable law burdening the exercise of religion, was the last straw. In direct response, Congress enacted RFRA, directing the federal courts to "restore" the "compelling interest test" that had been applied in *Sherbert* and *Yoder* "in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b). That is, by restoring the "compelling interest test," Congress restored the application of strict scrutiny, as applied in *Sherbert* and *Yoder*, to all government actions substantially burdening religion, and rejected the restrictive approach to free exercise claims taken in *Lyng*, *Roy*, *Goldman*, *O'Lone*, and *Lee*. But this directive does not specify what government actions substantially burden religion, thereby triggering the compelling interest test. RFRA did not "restore" any definition of "substantial burden." Because Congress did not define "substantial burden," either directly or by reference to pre-*Smith* case law, we should define (and in fact have defined) that term according to its ordinary meaning.

c. "Substantial Burden" Test Not Used in *Sherbert*, *Yoder*, and Other Pre-RFRA Cases To Rule Out Certain Burdens

According to the majority, pre-RFRA cases used the term "burden" or "substantial burden" to refer exclusively to burdens on religion imposed by only two particular types of government action. According to the majority, a "substantial burden" under RFRA can only be caused by government

action that either "coerce[s an individual] to act contrary to their religious beliefs under threat of sanctions, or condition[s] a governmental benefit upon conduct that would violate [an individual's] religious beliefs." Maj. op. at 10042. This restrictive definition of "substantial burden" cannot be found in *Sherbert*, *Yoder*, or any other case prior to the passage of RFRA.

In *Sherbert*, 374 U.S. 398, the Court held that a Seventh-day Adventist could not be denied unemployment benefits based on her refusal to work on Saturdays. Without using the phrase "substantial burden," the Court concluded that a requirement that the plaintiff work on Saturdays, on pain of being fired if she refused, "force[d] her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." *Id.* at 404. The Court compared such an imposition to a governmental fine: "Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship." *Id.* The Court therefore mandated that the requirement be justified by a "compelling state interest." *Id.* at 406-09.

In *Yoder*, 406 U.S. 205, the Court held that Amish children could not be required to attend school up to the age of sixteen, on penalty of criminal sanctions against their parents if they did not attend. Without using the phrase "substantial burden," the Court concluded that a requirement that children attend school, on pain of criminal punishment of their parents if they did not, "would gravely endanger if not destroy the free exercise of respondents' religious beliefs." *Id.* at 219. The Court therefore required, as it had in *Sherbert*, that the requirement be justified by a "compelling state interest." *Id.* at 221-29.

Neither *Sherbert* nor *Yoder* used the majority's substantial burden test as the trigger for the application of the compelling interest test. The Court in *Sherbert* and *Yoder* used the word

"burden," but nowhere defined, or even used, the phrase "substantial burden." After holding that the exercise of religion was burdened in each case, the Court simply did not opine on what other impositions on free exercise would, or would not, constitute a burden. That is, *Sherbert* and *Yoder* held that certain interferences with religious exercise trigger the compelling interest test. But neither case suggested that religious exercise can be "burdened," or "substantially burdened," *only* by the two types of interference considered in those cases. The phrase "substantial burden" is a creation of later cases which sometimes use *Sherbert* or *Yoder* as part of a string citation. *See*, *e.g.*, *Hernandez v. Commissioner of Internal Revenue*, 490 U.S. 680, 699 (1989). Neither *Sherbert* nor *Yoder*, nor any of the later cases, uses the restrictive definition of "substantial burden" invented by the majority today.

Nor do other pre-RFRA cases supply the majority's restrictive definition of "substantial burden." The majority relies heavily on *Lyng*, 485 U.S. 439, which relies in turn on *Roy*, 476 U.S. 693. In *Lyng*, tribal members challenged the construction of a proposed road on government land in the Chimney Rock area of the Six Rivers National Forest as infringing their rights under the Free Exercise Clause of the First Amendment. 485 U.S. at 442-42. The Court began its analysis by reiterating the holding of *Roy* that "[t]he Free Exercise Clause simply cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." 485 U.S. at 448 (quoting *Roy*, 476 U.S. at 699-700). The Court then reasoned:

> In both [*Lyng* and *Roy*], the challenged Government action would *interfere significantly* with private persons' ability to pursue spiritual fulfillment according to their own religious beliefs. In neither case, however, would the affected individuals be *coerced* by the Government's action into violating their religious beliefs; nor would either governmental action *penal-*

*ize* religious activity by denying any person an equal share of the rights, benefits, and privileges enjoyed by other citizens.

*Id.* at 449 (emphases added). The Court concluded that only "coercion" of the sort found in *Sherbert* and *Yoder* would trigger strict scrutiny because, "[t]he crucial word in the constitutional text is 'prohibit.' " *Id.* at 451.

Justice Brennan dissented from the majority's refusal to apply heightened scrutiny, emphasizing that the First Amendment "is directed against any form of governmental action that frustrates or inhibits religious practice." *Id.* at 459 (Brennan J., dissenting). In response, the *Lyng* majority conceded that the proposed road would have "severe adverse effects on the practice of [plaintiffs'] religion." *Id.* at 447. But the Court went out of its way to reject Justice Brennan's contention that the First Amendment is directed at governmental action that frustrates or inhibits religious practice. It responded, "The Constitution . . . says no such thing. Rather, it states: 'Congress shall make no law . . . *prohibiting* the free exercise [of religion].' " *Id.* at 456-57 (quoting *id.* at 459; U.S. Const. amend. I) (emphasis and alterations in original).

*Lyng* did not hold that the road at issue would cause no "substantial burden" on religious exercise. The Court in *Lyng* never used the phrase "substantial burden." Rather, *Lyng* held that government action that did not coerce religious practices or attach a penalty to religious belief was insufficient to trigger the compelling interest test *despite* the presence of a significant burden on religion. The Court explicitly recognized this in *Smith* when it wrote, "In [*Lyng*], we declined to apply *Sherbert* analysis to the Government's logging and road construction activities on lands used for religious purposes by several Native American Tribes, even though it was undisputed that the activities '*could have devastating effects on traditional Indian religious practices*.' " *Smith*, 494 U.S. at 883 (quoting *Lyng*, 485 U.S. at 451) (emphasis added).

The majority's attempt to read *Lyng* into RFRA is not just flawed. It is perverse. In refusing to apply the compelling interest test to the "severe adverse effects on the practice of [plaintiffs'] religion" in *Lyng*, the Court reasoned that the protections of the First Amendment "cannot depend on measuring the effects of a governmental action on a religious objector's spiritual development." 485 U.S. at 447, 451. The Court directly incorporated this reasoning into *Smith*. *See* 494 U.S. at 885. Congress then rejected this very reasoning when it restored the application of strict scrutiny "in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b).

In sum, it is clear that the interferences with the free exercise of religion that existed in *Sherbert* and *Yoder* qualify, to use the terminology of RFRA, as a "substantial burden." But the text, purpose, and enactment history of RFRA make equally clear that RFRA protects against burdens that, while imposed by a different mechanism than those in *Sherbert* and *Yoder*, are also "substantial."

### d. Purpose of RFRA

The express purpose of RFRA was to reject the restrictive approach to the Free Exercise Clause that culminated in *Smith* and to restore the application of strict judicial scrutiny "in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b). The majority's approach is fundamentally at odds with this purpose.

As should be clear, RFRA creates a legally protected interest in *the exercise of religion.* The protected interest in *Sherbert* was the right to take religious rest on Saturday, not the right to receive unemployment insurance. The protected interest in *Yoder* was the right to avoid secular indoctrination, not, as the majority contends, the right to avoid criminal punishment. See Maj. Op. at 10054-55 n.12.

Such interests in religious exercise can be severely burdened by government actions that do not deny a benefit or impose a penalty. For example, a court would surely hold that the government had imposed a "substantial burden" on the "exercise of religion" if it purchased by eminent domain every Catholic church in the country. Similarly, a court would surely hold that the Forest Service had imposed a "substantial burden" on the Indians' "exercise of religion" if it paved over the entirety of the San Francisco Peaks. We have already held that prison officials substantially burden religious exercise if they record the confessions of Catholic inmates, or refuse to provide Halal meat meals to a Muslim prisoner. *See Mockaitis v. Harcleroad*, 104 F.3d 1522, 1531 (9th Cir. 1997) ("A substantial burden is imposed on . . . free exercise of religion . . . by the intrusion into the Sacrament of Penance by officials of the state."); *Shakur v. Schriro*, 514 F.3d 878, 888-89 (9th Cir. 2008) (holding that failure of prison officials to provide Muslim prisoner with Halal or Kosher meat diet could constitute substantial burden on religious exercise under RLUIPA); *see also Lovelace v. Lee*, 472 F.3d 174, 198-99 (4th Cir. 2006) (holding that prisoner's right to religious diet under RLUIPA is clearly established for purposes of qualified immunity).

However, the majority's restrictive definition of "substantial burden" places such injuries entirely outside the coverage of RFRA because they are imposed through different mechanisms than those employed in *Sherbert* and *Yoder.* The majority cannot plausibly justify this result by arguing that the complete destruction of a religious shrine or place of worship, violation of a sacrament, or denial of a religious diet are less "substantial" restrictions on religious exercise than those caused by the denial of unemployment benefits. Rather, the majority refuses to apply strict scrutiny to these substantial injuries because, in its view, "a government that presides over a nation with as many religions as the United States of America [could not] function were it required to do so." *See* Maj. op. at 10042.

This proposition was explicitly rejected by RFRA, which directs courts to apply the compelling governmental interest test "in all cases" where there is a "substantial burden" on the "exercise of religion." *See* RFRA § 2000bb(a)(5) (stating that "the compelling interest test . . . is a workable test for striking sensible balances between religious liberty and competing prior governmental interests"). It has also been explicitly rejected by the Supreme Court. *See Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006) (rejecting the government's argument that the Controlled Substances Act "cannot function . . . if subjected to judicial exemptions" because "RFRA, and the strict scrutiny test it adopted, contemplate an inquiry more focused than the Government's categorical approach"); *id.* at 1215 ("Here the Government's uniformity argument rests not so much on the particular statutory program at issue as on slippery slope concerns that could be invoked in response to any RFRA claim . . ."). The majority's approach thus places beyond judicial scrutiny many burdens on religious exercise that RFRA was intended to prevent, and does so based on "slippery slope" arguments that the Supreme Court has instructed us to reject.

### e.    This Circuit's RFRA Precedents

As I have described above, the majority's narrow definition of "substantial burden" conflicts with RFRA's text and purpose. The majority's approach also conflicts with our prior application of RFRA in this circuit.

We first addressed the definition of "substantial burden" under RFRA in *Bryant v. Gomez*, 46 F.3d 948 (9th Cir. 1995). We stated that a "substantial burden" exists where:

> [A] governmental [action] burdens the adherent's practice of his or her religion . . . by preventing him or her from engaging in [religious] conduct *or having a religious experience* . . . . This interference

must be more than an inconvenience; the burden
must be substantial.

*Id.* at 949 (*quoting Graham v. C.I.R.*, 822 F.2d 844, 850-51
(9th Cir. 1987)) (second, third, and fifth alterations in *Bryant*)
(emphasis added). Since *Bryant*, we have repeatedly refused
to adopt the conclusion of the majority that "a 'substantial
burden' is imposed only when individuals are forced to
choose between following the tenets of their religion and
receiving a governmental benefit . . . or coerced to act con-
trary to their religious beliefs by the threat of civil or criminal
sanctions." Maj. op. at 10053. *See, e.g.*, *Worldwide Church of
God v. Philadelphia Church of God, Inc.,* 227 F.3d 1110,
1121 (9th Cir. 2000) (substantial burden where government
"prevent[s] [plaintiff] from engaging in [religious] conduct or
having a religious experience" and is "more than an inconve-
nience") (quoting *Goehring v. Brophy*, 94 F.3d 1294, 1299
(9th Cir. 1996); and *Bryant*, 46 F.3d at 949); *Stefanow v.
McFadden,* 103 F.3d 1466, 1471 (9th Cir. 1996) (same). We
have noted that "[a] statute burdens the free exercise of reli-
gion if it 'put[s] substantial pressure on an adherent to modify
his behavior and to violate his beliefs,' *including* when, if
enforced, it 'results in the choice to the individual of either
abandoning his religious principle or facing criminal prosecu-
tion.' " *Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir.
2002) (emphasis added) (quoting *Thomas v. Review Bd. of
Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981); *and
Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)). However,
nothing in our opinions suggests that the government can sub-
stantially burden religion *only* by applying a penalty or with-
holding a benefit based on religion.

In fact, we have held precisely the opposite. In *Mockaitis*,
a district attorney for Lane County, Oregon, with the assis-
tance of officials at the Lane County Jail, recorded the confes-
sion of a detained murder suspect to a Catholic priest. 104
F.3d at 1524-26. The prisoner and the priest learned of the
taping only after it occurred. *Id.* at 1526. Although the pris-

oner did not seek suppression of the tape, the priest, together with the Archbishop of Portland, sought an injunction under RFRA barring future taping. *Id.* at 1526-1527. We concluded the initial taping violated RFRA and held that an injunction was warranted because,

> A *substantial burden* is imposed on [the Archbishop's] free exercise of religion as the responsible head of the archdiocese of Portland by the intrusion into the Sacrament of Penance by officials of the state, an intrusion defended in this case by an assistant attorney-general of the state as not contrary to any law. Archbishop George has justifiable grounds for fearing that without a declaratory judgment and an injunction in this case the administration of the Sacrament of Penance for which he is responsible in his archdiocese will be made odious in jails by the intrusion of law enforcement officers.

*Id.* at 1531 (emphasis added). *Mockaitis* was not only correctly decided. It is also flatly inconsistent with the majority opinion.

The majority does not dispute that *Mockaitis* is inconsistent with its approach today, but instead argues that *Mockaitis* "cannot serve as precedent" for two reasons. Maj. op. at 10060-61 n.15. First, the Majority notes that *City of Boerne*, 521 U.S. at 532, overruled our application of RFRA to a state subdivision in *Mockaitis*. But the federalism holding of *City of Boerne*, 521 U.S. at 532, was entirely unrelated to our definition of "substantial burden." We do not normally discard our prior view of the law simply because it was expressed in a case that is overruled on unrelated grounds. To the contrary, this circuit has cited cases that have been "overruled on other grounds" in 1,508 opinions. *Mockaitis* continues to demonstrate that we have previously refused to adopt the majority's restrictive definition of "substantial burden."

Second, the majority finds *Mockaitis* "unhelpful" because it "did not define substantial burden, let alone analyze the substantial burden standard under the *Sherbert/Yoder* framework restored in RFRA, [or] attempt to explain why such framework should not apply to define substantial burden." Maj. op. at 10061 n.15. As I have explained above, RFRA did not employ the term "substantial burden" as a term of art limiting the application of RFRA to burdens caused by the precise mechanisms at issue in *Sherbert* and *Yoder*. In rejecting this argument, the majority dismisses *Mockaitis* precisely because it proves my point. That is, because *Mockaitis* does not treat "substantial burden" as a term of art limited to burdens caused by the precise mechanisms at issue in *Sherbert* and *Yoder*, the majority must perforce reject it. The conflict between *Mocktaitis* and the majority's approach today reflects the novelty of today's opinion, not any shortcomings of *Mocakaitis*.

Notably absent from the majority's opinion is any explanation of why the result reached in *Mockaitis* is incorrect. Under the majority's approach, it is clear that governmental eavesdropping on a prisoner's confession to his priest would not impose a substantial burden on the prisoner or priest under RFRA. This cannot be the law.

### f.   This Circuit's RLUIPA Precedents

Our cases interpreting the definition of "substantial burden" under RLUIPA have applied a similar definition to the definition employed in *Bryant*, 46 F.3d at 949. In applying RLUIPA, we have stated that "for a land use regulation to impose a 'substantial burden,' it must be 'oppressive' to a 'significantly great' extent. That is, a 'substantial burden' on 'religious exercise' must impose a significantly great restriction or onus upon such exercise." *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian College*, 360 F.3d at 1034). In other words, we have defined "substantial burden" according to the *effect* of a government

action on religious exercise rather than particular mechanisms by which this effect is achieved.

Moreover, we recently held that a substantial burden could exist under RLUIPA in a case that involved no imposition of a penalty or deprivation of a benefit. In *Shakur*, 514 F.3d 878, a Muslim inmate brought a RLUIPA challenge alleging that the Arizona Department of Corrections substantially burdened his exercise of religion by refusing to provide him with a Halal or Kosher meat diet. *Id.* at 888-89. The imposition on Shakur was in fact relatively mild because the prison provided him with a vegetarian diet as an alternative to the ordinary meat diet. *Id.* at 888, 891. Nonetheless, we found that Shakur had asserted a cognizable substantial burden under RLUIPA when he alleged that the vegetarian diet he was forced to eat for lack of Halal meat gave him indigestion, thereby disrupting his religious practices. *Id.* at 888. Because the Arizona Department of Corrections had not imposed any penalty or withheld any benefit from Shakur based on his exercise of religion, *Shakur* is, like *Mockaitis,* flatly inconsistent with the majority opinion.

In attempting to distinguish *Shakur*, the majority again refuses to accept the implications of its own rule. The majority claims that *Shakur* is a "straightforward application of the *Sherbert* test" because "the policy conditioned a governmental benefit to which Shakur was otherwise entitled—a meal in prison—upon conduct that would violate Shakur's religious beliefs." Maj. op. at 10068 n.24. However, like *Mockaitis, Shakur* applied the ordinary meaning of the phrase "substantial burden," which is inconsistent with the majority's newly minted "*Sherbert* test." In *Sherbert*, a Seventh-day Adventist was denied unemployment benefits after she was fired for refusing to work on Saturdays because, according to the state, she had "fail[ed], without good cause, to accept suitable work when offered." 374 U.S. at 399-400 (internal quotation marks omitted). In other words, the plaintiff in *Sherbert* was denied

a government benefit, to which she was otherwise entitled, because of her religious observance.

Contrary to the majority's assertions, the inmate in *Shakur* was not denied any government benefit to which he was otherwise entitled because of his religious observance. Shakur had a legal interest in *some* meal in prison, but he was never denied this interest as a consequence of his religious observance. Eating the vegetarian meals provided by the prison was permitted by Shakur's religion. Shakur had no legal interest in Halal meat meals, except to the extent the government's failure to provide them interfered with his subjective religious experience. Nonetheless, we held that the failure of the prison to provide Halal meat meals could constitute a substantial burden on Shakur's religious exercise because the vegetarian meals allegedly "exacerbate[d] [Shakur's] hiatal hernia and cause[d] excessive gas that interfere[d] with the ritual purity required for [Shakur's] Islamic worship." *Id.* at 889. That is, although the government had in no way penalized Shakur's exercise of his religion by denying a benefit to which he was otherwise entitled, we held that RFRA may impose an affirmative duty on prison officials to provide Halal meat meals where the failure to do so harms the inmate's sense of "ritual purity." *Id.*

The provision of special meals is a government action that benefits an inmate. But this is true of virtually any religious accommodation. Thus, *Shakur* can only be explained as consistent with the majority's rule if the mere accommodation of religion is a governmental benefit. But such a broad rule cannot support the majority's conclusion in this case. Under such a definition, the Forest Service offers the Indians in this case a "government benefit" in the form of access to their sacred land and ritual materials. The Forest Service's failure to offer spiritually pure sites and materials is the equivalent of prison officials failing to offer religiously pure meals. In short, in denying the Indians' claims, the majority contends that the phrase "substantial burden" applies only where the govern-

ment imposes sanctions or "condition[s] a governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs." The majority then abandons this definition in its attempts to distinguish *Shakur*, which did not involve the conditioning of government benefits on conduct that would violate religious beliefs. The need for such semantic contortions only highlights the degree to which the majority's rule is inconsistent with our prior case law and fails to capture the meaning of the term "substantial burden."

### 2.   The Applicability of RLUIPA

The majority's second misstatement is that RLUIPA does not apply to suits brought under RFRA. It writes:

> For two reasons, RLUIPA is inapplicable to this case. First, RLUIPA, by its terms, prohibits only state and local governments from applying regulations that govern land use or institutionalized persons to impose a "substantial burden" on the exercise of religion. . . . Subject to two exceptions not relevant here, RLUIPA does not apply to a federal government action, which is not at issue in this case. . . . Second, even for state and local governments, RLUIPA applies only to government land-use regulations of private land, not to the government's management of its own land.

Maj. op. at 10066. From this, the majority concludes that RLUIPA cases finding a "substantial burden" on the exercise of religion are irrelevant to RFRA cases.

It is true that much of RLUIPA applies specifically to state and local zoning decisions and to actions by prison officials. But it is demonstrably *not* true that RLUIPA is "inapplicable to this case," and that cases decided under RLUIPA may be disregarded in RFRA cases. Not only did RLUIPA amend the definition of "exercise of religion" contained in RFRA,

RLUIPA also applies the same "substantial burden" test that is applied in RFRA cases.

Prior to the passage of RLUIPA in 2000, RFRA provided that "the term 'exercise of religion' means the exercise of religion under the First Amendment to the Constitution." Pub. L. No. 103-141, § 5, 107 Stat. at 1489 (codified at 42 U.S.C. § 2000bb-2(4) (1994) (repealed)). RLUIPA changed the definition of "exercise of religion" in RFRA. RLUIPA §§ 7-8, 114 Stat. at 806-07. As a result of RLUIPA, 42 U.S.C. § 2000bb-2 now provides, "*As used in this chapter* — . . . (4) the term 'exercise of religion' means religious exercise, *as defined in section 2000cc-5 of this title.*" (emphasis added). The "chapter" to which 2000bb-2 refers is Chapter 21B of Title 42. Chapter 21B is the codification of the Religious Freedom Restoration Act. Section 2000cc-5, to which § 2000bb-2 refers, provides, "The term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."

RFRA and RLUIPA not only share the same definition of "exercise of religion," they also share the same analytic framework and terminology. Under both statutes, the imposition of a "substantial burden" on a person's "exercise of religion" may be justified only by a compelling governmental interest and a showing that such interest is furthered by the least restrictive means. *See* 42 U.S.C. § 2000bb-1(b) (RFRA); 42 U.S.C. § 2000cc-1(a)(1-2) (RLUIPA). The Supreme Court has explicitly stated that "the Religious Land Use and Institutionalized Persons Act of 2000 . . . allows federal and state prisoners to seek religious accommodation *pursuant to the same standard* as set forth in RFRA[.]" *O Centro*, 546 U.S. at 436 (emphasis added). Because RFRA and RLUIPA cases share the same analytic framework and terminology and are, in the words of the Court in *O Centro*, governed by the "same standard," RLUIPA cases are necessarily applicable to RFRA cases.

### 3.  Applicability of RFRA to Federal Land

Finally, the majority misstates the law when it treats as an open question whether RFRA applies to federal land. The majority writes:

> The Defendants do not contend that RFRA is inapplicable to the government's use and management of its own land, which is at issue in this case. Because this issue was not raised or briefed by the parties, we have no occasion to consider it. Therefore, we assume, without deciding, that RFRA applies to the government's use and management of its land[.]

Maj. op. at 10048 n.9.

It is hardly an open question whether RFRA applies to federal land. For good reason, none of the defendants argued that RFRA is inapplicable to actions on federal land. There is nothing in the text of RFRA that says, or even suggests, that such a carve-out from RFRA exists. No case has ever so held, or even suggested, that RFRA is inapplicable to federal land.

The majority opinion uses silence of the briefs in this case as an excuse to treat the applicability of RFRA to federal land as an open question. However, the majority ignores the following exchange with the government's attorney during oral argument before the en banc panel. In that exchange, the government explicitly stated that RFRA applies to federal land:

> Question [by a member of the en banc panel]: Is it your position that the substantial burden test is simply never triggered when the government is using its own land? That it's simply outside the coverage of RFRA if the government is using its own land?
>
> Answer [by the government's attorney]: No, your honor, that is not our position. . . .

Question: So, the use of government land has the
potential under RFRA to impose a substantial bur-
den?

Answer: It is possible that certain activities on cer-
tain government land can still substantially burden
religious activities.

Question: And would then violate RFRA if there
were no compelling state interest?

Answer: Correct. Yes.

[En banc argument at 35:06.]

D.   Misunderstanding of Religious Belief and Practice

In addition to misstating the law under RFRA, the majority
misunderstands the nature of religious belief and practice. The
majority concludes that spraying up to 1.5 million gallons of
treated sewage effluent per day on Humphrey's Peak, the
most sacred of the San Francisco Peaks, does not impose a
"substantial burden" on the Indians' "exercise of religion." In
so concluding, the majority emphasizes the lack of physical
harm. According to the majority, "[T]here are no plants,
springs, natural resources, shrines with religious significance,
nor any religious ceremonies that would be physically affect-
ed" by using treated sewage effluent to make artificial snow.
In the majority's view, the "sole effect" of using treated sew-
age effluent on Humphrey's Peak is on the Indians' "subjec-
tive spiritual experience." Maj. op. at 10041.

The majority's emphasis on physical harm ignores the
nature of religious belief and exercise, as well as the nature
of the inquiry mandated by RFRA. The majority characterizes
the Indians' religious belief and exercise as merely a "subjec-
tive spiritual experience." Though I would not choose pre-
cisely those words, they come close to describing what the

majority thinks it is *not* describing — a genuine religious belief and exercise. Contrary to what the majority writes, and appears to think, religious exercise invariably, and centrally, involves a "subjective spiritual experience."

Religious belief concerns the human spirit and religious faith, not physical harm and scientific fact. Religious exercise sometimes involves physical things, but the physical or scientific character of these things is secondary to their spiritual and religious meaning. The centerpiece of religious belief and exercise is the "subjective" and the "spiritual." As William James wrote, religion may be defined as "the feelings, acts, and experiences of individual men [and women] in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." WILLIAM JAMES, THE VARIETIES OF RELIGIOUS EXPERIENCE: A STUDY IN HUMAN NATURE 31-32 (1929).

The majority's misunderstanding of the nature of religious belief and exercise as merely "subjective" is an excuse for refusing to accept the Indians' religion as worthy of protection under RFRA. According to undisputed evidence in the record, and the finding of the district court, the Indians in this case are sincere in their religious beliefs. The record makes clear that their religious beliefs and practice do not merely require the continued existence of certain plants and shrines. They require that these plants and shrines be spiritually pure, undesecrated by treated sewage effluent.

Perhaps the strength of the Indians' argument in this case could be seen more easily by the majority if another religion were at issue. For example, I do not think that the majority would accept that the burden on a Christian's exercise of religion would be insubstantial if the government permitted only treated sewage effluent for use as baptismal water, based on an argument that no physical harm would result and any adverse effect would merely be on the Christian's "subjective spiritual experience." Nor do I think the majority would

accept such an argument for an orthodox Jew if the government permitted only non-Kosher food.

## E.   Proper Application of RFRA

Applying our precedents, which properly reject the majority's restrictive approach, I would hold that the Indians have shown a substantial burden on the exercise of their religion under RFRA. I also believe that the Forest Service has failed to show that approval of the Snowbowl expansion was the least restrictive means to further a compelling governmental interest.

### 1.   "Substantial Burden" on the "Exercise of Religion"

RFRA defines "exercise of religion" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § § 2000bb-2(4), 2000cc-5(7)(A). Under our prior case law, a "substantial burden" on the "exercise of religion" exists where government action prevents an individual "from engaging in [religious] conduct or having a religious experience" and the interference is "more than an inconvenience." *Bryant,* 46 F.3d at 949.

### a.   The Indians' "Sacred" Land and their "Exercise of Religion"

The Appellees do not dispute the sincerity of the Indians' testimony concerning their religious beliefs and practices, and the district court wrote that it was not "challenging the honest religious beliefs of any witness." The majority concedes that the Indians are sincere. It writes, "The district court found the Plaintiffs' beliefs to be sincere; there is no basis to challenge that finding." Maj. op. at 10041.

The majority seeks to undermine the importance of the district court's finding, and its own concession, by contending that the Indians consider virtually everything sacred. It writes:

In the Coconino National Forest alone, there are approximately a dozen mountains recognized as sacred by American Indian tribes. The district court found the tribes hold other landscapes to be sacred as well, such as canyons and canyon systems, rivers and river drainages, lakes, discrete mesas and buttes, rock formations, shrines, gathering areas, pilgrimage routes, and prehistoric sites. Within the Southwestern Region forest lands alone, there are between 40,000 and 50,000 prehistoric sites. The district court also found the Navajo and the Hualapai Plaintiffs consider the entire Colorado River to be sacred. New sacred areas are continuously being recognized by the Plaintiffs.

Maj. op. at 10046 n.7 (citations omitted).

The majority implies that if we hold, based on the sincerity of the Indians's religious belief, that there has been a substantial burden in this case, there is no stopping place. That is, since virtually everything is sacred, virtually any governmental action affecting the Indians' "sacred" land will be a substantial burden under RFRA.

The majority's implication rests upon an inadequate review of the record. The district court conducted a two-week trial devoted solely to the Indians' RFRA claim. The trial record demonstrates that the word "sacred" is a broad and undifferentiated term. That term does not capture the various degrees in which the Indians hold land to be sacred. For example, Vincent Randall, an Apache legislator, historian, and cultural teacher, responded to a question regarding mountains that were "sacred sites" as follows:

That's your term "sacred." That's not my term. I talked about holy mountains this morning. I talked about God's mountains. . . . Sacred to you is not the other terms. There are other places of honor and

respect. You're looking at everything as being sacred. There is not — there is honor and respect, just as much as the Twin Towers is a place of honor and respect. Gettysburg. Yes, there are places like that in Apache land, *but there are four holy mountains. Holy mountains*.

Trial tr. 722-23 (emphasis added).

Dianna Uqualla, subchief of the Havasupai, again explained that there are different degrees of "sacred":

The whole reservation is sacred to us, *but the mountains are more sacred*. They are like our — if you go to a church there would be like our tabernacle, that would be our altars. That's the — that's the difference like being in Fort Defiance or Window Rock versus going to each of the sacred mountains. The San Francisco Peaks would be like our tabernacle, our altar to the west.

SER 1253 (emphasis added).

Many White Mountain Apache, Navajo, and Havasupai members refer to all land that is owned, or was ever owned, by their tribe as sacred. For example, Ramon Riley, Cultural Resource Director for the White Mountain Apache, testified that the entire Apache reservation is "sacred." Trial tr. at 625, 647-51. Uqualla testified to the same effect with respect to Havasuapai land. SER 1253.

But while there are many mountains within White Mountain Apache, Navajo, and Havasupai historic territory, only a few of these mountains are "holy" or particularly "sacred." For the White Mountain Apache, there are four holy mountains. They are the San Francisco Peaks, Mt. Graham, Mt. Baldy, and Red Mountain/Four Peaks. Trial tr. at 639-43. For the Navajo, there are also four holy mountains. They are the

San Francisco Peaks, the Blanca Peak, Mt. Taylor, and the Hesperous Mountains. Trial tr. at 739.

The Indians allow different uses on sacred land depending the degree of sacredness. For example, Mount Baldy is one of the White Mountain Apache's holy mountains. Though they consider all of their reservation land "sacred" in the sense in which that term is used by the majority, Mount Baldy is not merely sacred. It is holy. The record is clear that the Apache do not permit camping, fishing, or hunting on the portion of Mount Baldy under their control, even though they permit such activities elsewhere on their reservation.

b.   Substantial Burden on the Indians' Exercise of Religion

The record in this case makes clear that the San Francisco Peaks are particularly sacred to the surrounding Indian tribes. Humphrey's Peak is the most sacred, or holy, of the Peaks. I accept as sincere the Indians' testimony about their religious beliefs and practices, and I accept as sincere their testimony that the Peaks, and in particular Humphrey's Peak, are not merely sacred but holy mountains.

In the discussion that follows, I focus on the evidence presented by the Hopi and Navajo, and to a lesser extent on the Hualapai and Havasupai. I first describe the Indians' religious practices, and then discuss the effect the Snowbowl expansion would have on these practices.

i.   The Indians' Religious Practices

(1)   The Hopi

Hopi religious beliefs and practices center on the San Francisco Peaks. As stated by the district court, "The Peaks are where the Hopi direct their prayers and thoughts, a point in the physical world that defines the Hopi universe and serves as the home of the Kachinas, who bring water, snow and life

to the Hopi people." 408 F. Supp. 2d at 894. The Hopi have been making pilgrimages to the Peaks since at least 1540, when they first encountered Europeans, and probably long before that.

The Hopi believe that when they emerged into this world, the clans journeyed to the Peaks (or *Nuvatukyaovi*, the "high place of snow") to receive instructions from a spiritual presence, *Ma'saw*. At the Peaks, they entered a spiritual covenant with *Ma'saw* to take care of the land, and then migrated down to the Hopi villages. The Hopi re-enact their emergence from the Peaks annually, and Hopi practitioners look to the Peaks in their daily songs and prayers as a place of tranquility, sanctity, and purity.

The Peaks are also the primary home of the powerful spiritual beings called *Katsinam* (Hopi plural of *Katsina*, or Kachina in English). Hundreds of specific *Katsinam* personify the spirits of plants, animals, people, tribes, and forces of nature. The *Katsinam* are the spirits of Hopi ancestors, and the Hopi believe that when they die, their spirits will join the *Katsinam* on the Peaks. As spiritual teachers of "the Hopi way," the *Katsinam* teach children and remind adults of the moral principles by which they must live. These principles are embodied in traditional songs given by the *Katsinam* to the Hopi and sung by the Hopi in their everyday lives. One Hopi practitioner compared these songs to sermons, which children understand simplistically but which adults come to understand more profoundly. Many of these songs focus on the Peaks.

*Katsinam* serve as intermediaries between the Hopi and the higher powers, carrying prayers from the Hopi villages to the Peaks on an annual cycle. From July through January, the *Katsinam* live on the Peaks. In sixteen days of ceremonies and prayers at the winter solstice, the Hopi pray and prepare for the *Katsinam*'s visits to the villages. In February or March, the *Katsinam* begin to arrive, and the Hopi celebrate with nightly dances at which the *Katsinam* appear in costume and

perform. The *Katsinam* stay while the Hopi plant their corn and it germinates. Then, in July, the Hopi mark the *Katsinam*'s departure for the Peaks.

The Hopi believe that pleasing the *Katsinam* on the Peaks is crucial to their livelihood. Appearing in the form of clouds, the *Katsinam* are responsible for bringing rain to the Hopi villages from the Peaks. The *Katsinam* must be treated with respect, lest they refuse to bring the rains from the Peaks to nourish the corn crop. In preparation for the *Katsinam*'s arrival, prayer sticks and feathers are delivered to every member of the village, which they then deposit in traditional locations, praying for the spiritual purity necessary to receive the *Katsinam*. The *Katsinam* will not arrive until the peoples' hearts are in the right place, a state they attempt to reach through prayers directed at the spirits on the Peaks.

The Hopi have at least fourteen shrines on the Peaks. Every year, religious leaders select members of each of the approximately forty congregations, or *kiva*, among the twelve Hopi villages to make a pilgrimage to the Peaks. They gather from the Peaks both water for their ceremonies and boughs of Douglas fir worn by the *Katsinam* in their visits to the villages.

### (2) The Navajo

The Peaks are also of fundamental importance to the religious beliefs and practices of the Navajo. The district court found, "[T]he Peaks are considered . . . to be the 'Mother of the Navajo People,' their essence and their home. The whole of the Peaks is the holiest of shrines in the Navajo way of life." 408 F. Supp. 2d at 889. Considering the mountain "like family," the Navajo greet the Peaks daily with prayer songs, of which there are more than one hundred relating to the four mountains sacred to the Navajo. Witnesses described the Peaks as "our leader" and "very much an integral part of our life, our daily lives."

The Navajo creation story revolves around the Peaks. The mother of humanity, called the Changing Woman and compared by one witness to the Virgin Mary, resided on the Peaks and went through puberty there, an event which the people celebrated as a gift of new life. Following this celebration, called the *kinaalda*, the Changing Woman gave birth to twins, from whom the Navajo are descended. The Navajo believe that the Changing Woman's *kinaalda* gave them life, generation after generation. Young women today still celebrate their own *kinaalda* with a ceremony one witness compared to a Christian confirmation or a Jewish bat mitzvah. The ceremony sometimes involves water especially collected from the Peaks because of the Peaks' religious significance.

The Peaks are represented in the Navajo medicine bundles found in nearly every Navajo household. The medicine bundles are composed of stones, shells, herbs, and soil from each of four sacred mountains. One Navajo practitioner called the medicine bundles "our Bible," because they have "embedded" within them "the unwritten way of life for us, our songs, our ceremonies." The practitioner traced their origin to the Changing Woman: When her twins wanted to find their father, the Changing Woman instructed them to offer prayers to the Peaks and conduct ceremonies with medicine bundles. The Navajo believe that the medicine bundles are conduits for prayers; by praying to the Peaks with a medicine bundle containing soil from the Peaks, the prayer will be communicated to the mountain.

As their name suggests, medicine bundles are also used in Navajo healing ceremonies, as is medicine made with plants collected from the Peaks. Appellant Norris Nez, a Navajo medicine man, testified that "like the western doctor has his black bag with needles and other medicine, this bundle has in there the things to apply medicine to a patient." Explaining why he loves the mountain as his mother, he testified, "She is holding medicine and things to make us well and healthy. We suckle from her and get well when we consider her our

Mother." Nez testified that he collects many different plants from the Peaks to make medicine.

The Peaks play a role in every Navajo religious ceremony. The medicine bundle is placed to the west, facing the Peaks. In the Blessingway ceremony, called by one witness "the backbone of our ceremony" because it is performed at the conclusion of all ceremonies, the Navajo pray to the Peaks by name.

The purity of nature, including the Peaks, plays an important part in Navajo beliefs. Among other things, it affects how a medicine bundle — described by one witness as "a living basket" — is made. The making of a medicine bundle is preceded by a four-day purification process for the medicine man and the keeper of the bundle. By Navajo tradition, the medicine bundle should be made with leather from a buck that is ritually suffocated; the skin cannot be pierced by a weapon. Medicine bundles are "rejuvenated" every few years, by replacing the ingredients with others gathered on pilgrimages to the Peaks and three other sacred mountains.

The Navajo believe their role on earth is to take care of the land. They refer to themselves as *nochoka dine*, which one witness translated as "people of the earth" or "people put on the surface of the earth to take care of the lands." They believe that the Creator put them between four sacred mountains of which the westernmost is the Peaks, or *Do'ok'oos-liid* ("shining on top," referring to its snow), and that the Creator instructed them never to leave this homeland. Although the whole reservation is sacred to the Navajo, the mountains are the most sacred part. As noted previously, one witness drew an analogy to a church, with the area within the mountains as the part of the church where the people sit, and the Peaks as "our altar to the west."

As in Hopi religious practice, the Peaks are so sacred in Navajo beliefs that, according to Joe Shirley, Jr., President of

the Navajo Nation, a person "cannot just voluntarily go up on this mountain at any time. It's — it's the holiest of shrines in our way of life. You have to sacrifice. You have to sing certain songs before you even dwell for a little bit to gather herbs, to do offerings." After the requisite preparation, the Navajo go on pilgrimages to the Peaks to collect plants for ceremonial and medicinal use.

### (3)   The Hualapai

The Peaks figure centrally in the beliefs of the Hualapai. The Hualapai creation story takes place on the Peaks. The Hualapai believe that at one time the world was deluged by water, and the Hualapai put a young girl on a log so that she could survive. She landed on the Peaks, alone, and washed in the water. In the water, she conceived a son, who was a man born of water. She washed again, and conceived another son. These were the twin warriors or war gods, from whom the Hualapai are today descended. Later, one of the twins became ill, and the other collected plants and water from the Peaks, thereby healing his brother. From this story comes the Hualapai belief that the mountain and its water and plants are sacred and have medicinal properties. One witness called the story of the deluge, the twins, and their mother "our Bible story" and drew a comparison to Noah's Ark. As in Biblical parables and stories, Hualapai songs and stories about the twins are infused with moral principles.

Hualapai spiritual leaders travel to the Peaks to deliver prayers. Like the Hopi and the Navajo, the Hualapai believe that the Peaks are so sacred that one has to prepare oneself spiritually to visit. A spiritual leader testified that he prays to the Peaks every day and fasts before visiting to perform the prayer feather ceremony. In the prayer feather ceremony, a troubled family prays into an eagle feather for days, and the spiritual leader delivers it to the Peaks; the spirit of the eagle then carries the prayer up the mountain and to the Creator.

The Hualapai collect water from the Peaks. Hualapai religious ceremonies revolve around water, and they believe water from the Peaks is sacred. In their sweat lodge purification ceremony, the Hualapai add sacred water from the Peaks to other water, and pour it onto heated rocks to make steam. In a healing ceremony, people seeking treatment drink from the water used to produce the steam and are cleansed by brushing the water on their bodies with feathers. At the conclusion of the healing ceremony, the other people present also drink the water. A Hualapai tribal member who conducts healing ceremonies testified that water from the Peaks is used to treat illnesses of "high parts" of the body like the eyes, sinuses, mouth, throat, and brain, including tumors, meningitis, forgetfulness, and sleepwalking. He testified that the Peaks are the only place to collect water with those medicinal properties, and that he travels monthly to the Peaks to collect it from Indian Springs, which is lower on the mountain and to the west of the Snowbowl. The water there has particular significance to the Hualapai because the tribe's archaeological sites are nearby.

In another Hualapai religious ceremony, when a baby has a difficult birth, a Hualapai spiritual leader brings a portion of the placenta to the Peaks so that the child will be strong like the twins and their mother in the Hualapai creation story. The Hualapai also grind up ponderosa pine needles from the Peaks in sacred water from the Peaks to aid women in childbirth.

A Hualapai religious law forbids mixing the living and the dead. In testimony in the district court, a spiritual leader gave the example of washing a baby or planting corn immediately after taking part in a death ceremony. Mixing the two will cause a condition that was translated into English as "the ghost sickness." The leader testified that purification after "touching death" depends on the intensity of the encounter. If he had just touched the dead person's clothes or belongings, he might be purified in four days, but if he touched a body, it would require a month.

(4)   The Havasupai

The Peaks are similarly central to the beliefs of the Havasupai, as the Forest Service acknowledged in the FEIS:

> The Hualapai and the Havasupai perceive the world as flat, marked in the center by the San Francisco Peaks, which were visible from all parts of the Havasupai territory except inside the Grand Canyon. The commanding presence of the Peaks probably accounts for the Peaks being central to the Havasupai beliefs and traditions, even though the Peaks themselves are on the edge of their territory.

The Chairman of the Havasupai testified that the Peaks are the most sacred religious site of the Havasupai: "That is where life began." The Havasupai believe that when the earth was submerged in water, the tribe's "grandmother" floated on a log and landed and lived on the Peaks, where she survived on water from the Peaks' springs and founded the tribe.

Water is central to the religious practices of the Havasupai. Although they do not travel to the Peaks to collect water, Havasupai tribal members testified that they believe the water in the Havasu creek that they use in their sweat lodges comes ultimately from the Peaks, to which they pray daily. They believe that spring water is a living, life-giving, pure substance, and they do not use tap water in their religious practices. They perform sweat lodge ceremonies, praying and singing as they use the spring water to make steam; they believe that the steam is the breath of their ancestors, and that by taking it into themselves they are purified, cleansed, and healed. They give water to the dead to take with them on their journey, and they use it to make medicines. The Havasupai also gather rocks from the Peaks to use for making steam.

ii.   The Burden Imposed by the Proposed Snowbowl
Expansion

Under the proposed expansion of the Snowbowl, up to 1.5 million gallons per day of treated sewage effluent would be sprayed on Humphrey's Peak from November through February. Depending on weather conditions, substantially more than 100 million gallons of effluent could be deposited over the course of the winter ski season.

The Indians claim that the use of treated sewage effluent to make artificial snow on the Peaks would substantially burden their exercise of religion. Because the Indians' religious beliefs and practices are not uniform, the precise burdens on religious exercise vary among the Appellants. Nevertheless, the burdens fall roughly into two categories: (1) the inability to perform a particular religious ceremony, because the ceremony requires collecting natural resources from the Peaks that would be too contaminated — physically, spiritually, or both — for sacramental use; and (2) the inability to maintain daily and annual religious practices comprising an entire way of life, because the practices require belief in the mountain's purity or a spiritual connection to the mountain that would be undermined by the contamination.

The first burden — the inability to perform religious ceremonies because of contaminated resources — has been acknowledged and described at length by the Forest Service. The FEIS summarizes: "Snowmaking and expansion of facilities, especially the use of reclaimed water, would contaminate the natural resources needed to perform the required ceremonies that have been, and continue to be, the basis for the cultural identity for many of these tribes." Further, "the use of reclaimed water is believed by the tribes to be impure and would have an irretrievable impact on the use of the soil, plants, and animals for medicinal and ceremonial purposes throughout the entire Peaks, as the whole mountain is regarded as a single, living entity."

Three Navajo practitioners' testimony at trial echoed the Forest Service's assessment in describing how the proposed action would prevent them from performing various ceremonies. Larry Foster, a Navajo practitioner who is training to become a medicine man, testified that "once water is tainted and if water comes from mortuaries or hospitals, for Navajo there's no words to say that that water can be reclaimed." He further testified that he objected to the current use of the Peaks as a ski area, but that using treated sewage effluent to make artificial snow on the Peaks would be "far more serious." He explained, "I can live with a scar as a human being. But if something is injected into my body that is foreign, a foreign object — and reclaimed water, in my opinion, could be water that's reclaimed through sewage, wastewater, comes from mortuaries, hospitals, there could be disease in the waters — and that would be like injecting me and my mother, my grandmother, the Peaks, with impurities, foreign matter that's not natural."

Foster testified that if treated sewage effluent were used on the Peaks he would no longer be able to go on the pilgrimages to the Peaks that are necessary to rejuvenate the medicine bundles, which are, in turn, a part of every Navajo healing ceremony. He explained:

> Your Honor, our way of life, our culture we live in — we live in the blessingway, in harmony. We try to walk in harmony, be in harmony with all of nature. And we go to all of the sacred mountains for protection. We go on a pilgrimage similar to Muslims going to Mecca. And we do this with so much love, commitment and respect. And if one mountain — and more in particularly with the San Francisco Peaks — which is our bundle mountain, or sacred, bundle mountain, were to be poisoned or given foreign materials that were not pure, it would create an imbalance — there would not be a place among the sacred mountains. We would not be able to go there

to obtain herbs or medicines to do our ceremonies, because that mountain would then become impure. It would not be pure anymore. And it would be a devastation for our people.

Appellant Navajo medicine man Norris Nez testified that the proposed action would prevent him from practicing as a medicine man. He told the district court that the presence of treated sewage effluent would "ruin" his medicine, which he makes from plants collected from the Peaks. He also testified that he would be unable to perform the fundamental Blessingway ceremony, because "all [medicine] bundles will be affected and we will have nothing to use eventually."

Foster, Nez, and Navajo practitioner Steven Begay testified that because they believe the mountain is an indivisible living entity, the entire mountain would be contaminated even if the millions of gallons of treated sewage effluent are put onto only one area of the Peaks. According to Foster, Nez, and Begay, there would be contamination even on those parts of the Peaks where the effluent would not come into physical contact with particular plants or ceremonial areas. To them, the contamination is not literal in the sense that a scientist would use the term. Rather, the contamination represents the poisoning of a living being. In Foster's words, "[I]f someone were to get a prick or whatever from a contaminated needle, it doesn't matter what the percentage is, your whole body would then become contaminated. And that's what would happen to the mountain." In Nez's words, "All of it is holy. It is like a body. It is like our body. Every part of it is holy and sacred." In Begay's words, "All things that occur on the mountain are a part of the mountain, and so they will have connection to it. We don't separate the mountain."

The Hualapai also presented evidence that the proposed action would prevent them from performing particular religious ceremonies. Frank Mapatis, a Hualapai practitioner and spiritual leader who visits the Peaks approximately once a

month to collect water for ceremonies and plants for medicine, testified that the use of treated sewage effluent would prevent him from performing Hualapai sweat lodge and healing ceremonies with the sacred water from the Peaks. Mapatis testified that he believes that the treated sewage effluent would seep into the ground and into the spring below the Snowbowl where he collects his sacred water, so that the spring water would be "contaminated" by having been "touched with death." Because contact between the living and the dead induces "ghost sickness," which involves hallucinations, using water touched with death in healing ceremonies "would be like malpractice." Further, Mapatis would become powerless to perform the healing ceremony for ghost sickness itself, because that ceremony requires water from the Peaks, the only medicine for illnesses of the upper body and head, like hallucinations.

The second burden the proposed action would impose — undermining the Indians' religious faith, practices, and way of life by desecrating the Peaks' purity— is also shown in the record. The Hopi presented evidence that the presence of treated sewage effluent on the Peaks would fundamentally undermine all of their religious practices because their way of life, or "beliefway," is largely based on the idea that the Peaks are a pure source of their rains and the home of the *Katsinam*.

Leigh Kuwanwisiwma, a Hopi religious practitioner and the director of the tribe's Cultural Preservation Office, explained the connection between contaminating the Peaks and undermining the Hopi religion:

> The spiritual covenant that the Hopi clans entered into with the Caretaker I refer to as Ma'saw, the spiritual person and the other d[ei]ties that reside — and the Katsina that reside in the Peaks started out with the mountains being in their purest form. They didn't have any real intrusion by humanity.

> The purity of the spirits, as best we can acknowl-
> edge the spiritual domain, we feel were content in
> receiving the Hopi clans. So when you begin to
> intrude on that in a manner that is really disrespect-
> ful to the Peaks and to the spiritual home of the Kat-
> sina, it affects the Hopi people. It affects the Hopi
> people, because as clans left and embarked on their
> migrations and later coming to the Hopi villages, we
> experienced still a mountain and peaks that were in
> their purest form as a place of worship to go to, to
> visit, to place our offerings, the tranquility, the sanc-
> tity that we left a long time ago was still there.

Antone Honanie, a Hopi practitioner, testified that he would
have difficulty preparing for religious ceremonies, because
treated sewage effluent is "something you can't get out of
your mind when you're sitting there praying" to the mountain,
"a place where everything is supposed to be pure." Emory
Sekaquaptewa, a Hopi tribal member and research anthropol-
ogist, testified that the desecration of the mountain would
cause *Katsinam* dance ceremonies to lose their religious
value. They would "simply be a performance for perfor-
mance['s] sake" rather than "a religious effort": "Hopi people
are raised in this belief that the mountains are a revered place.
And even though they begin with kind of a fantasy notion,
this continues to grow into a more deeper spiritual sense of
the mountain. So that any thing that interrupts this perception,
as they hold it, would tend to undermine the — the integrity
in which they hold the mountain."

Summarizing the Hopi's testimony, the district court wrote:

> The individual Hopi's practice of the Hopi way per-
> meates every part and every day of the individual's
> life from birth to death. . . . The Hopi Plaintiffs testi-
> fied that the proposed upgrades to the Snowbowl
> have affected and will continue to negatively affect
> the way they think about the Peaks, the Kachina and

themselves when preparing for any religious activity involving the Peaks and the Kachina — from daily morning prayers to the regular calendar of religious dances that occur throughout the year. . . . The Hopi Plaintiffs also testified that this negative effect on the practitioners' frames of mind due to the continued and increased desecration of the home of the Kachinas will undermine the Hopi faith and the Hopi way. According to the Hopi, the Snowbowl upgrades will undermine the Hopi faith in daily ceremonies and undermine the Hopi faith in their Kachina ceremonies as well as their faith in the blessings of life that they depend on the Kachina to bring.

408 F. Supp. 2d at 894-95.

The Havasupai presented evidence that the presence of treated sewage effluent on the Peaks would, by contaminating the Peaks, undermine their sweat lodge purification ceremonies and could lead to the end of the ceremonies. Rex Tilousi, Chairman of the Havasupai, testified that Havasupai religious stories teach that the water in Havasu Creek, which they use for their sweat ceremonies, flows from the Peaks, where the Havasupai believe life began. Although none of the three Havasupai witnesses stated that they would be completely unable to perform the sweat lodge ceremonies as a consequence of the impurity introduced by the treated sewage effluent, Roland Manakaja, a traditional practitioner, testified that the impurity would disrupt the ceremony:

If I was to take the water to sprinkle the rocks to bring the breath of our ancestors — we believe the steam is the breath of our ancestors. And the rocks placed in the west signify where our ancestors go, the deceased. . . . Once the steam rises, like it does on the Peaks, the fog or the steam that comes off is creation. And once the steam comes off and it comes into our being, it purifies and cleanses us and we go

> to the level of trance. . . . It's going to impact men-
> tally my spirituality. Every time I think about sprin-
> kling that water on the rocks, I'm going to always
> think about this sewer that they're using to recharge
> the aquifer.

He further testified that he was "concerned" that the water's
perceived impurity might cause the sweat lodge ceremony to
die out altogether, if tribal members fear "breathing the organ-
isms or the chemicals that may come off the steam."

The record supports the conclusion that the proposed use of
treated sewage effluent on the San Francisco Peaks would
impose a burden on the religious exercise of all four tribes
discussed above — the Navajo, the Hopi, the Hualapai, and
the Havasupai. However, on the record before us, that burden
falls most heavily on the Navajo and the Hopi. The Forest
Service itself wrote in the FEIS that the Peaks are the most
sacred place of both the Navajo and the Hopi; that those
tribes' religions have revolved around the Peaks for centuries;
that their religious practices require pure natural resources
from the Peaks; and that, because their religious beliefs dic-
tate that the mountain be viewed as a whole living being, the
treated sewage effluent would in their view contaminate the
natural resources throughout the Peaks. Navajo Appellants
presented evidence in the district court that, were the pro-
posed action to go forward, contamination by the treated sew-
age effluent would prevent practitioners from making or
rejuvenating medicine bundles, from making medicine, and
from performing the Blessingway and healing ceremonies.
Hopi Appellants presented evidence that, were the proposed
action to go forward, contamination by the effluent would
fundamentally undermine their entire system of belief and the
associated practices of song, worship, and prayer, that depend
on the purity of the Peaks, which is the source of rain and
their livelihoods and the home of the *Katsinam* spirits.

In light of this showing, it is self-evident that the Snow-
bowl expansion prevents the Navajo and Hopi "from engag-

ing in [religious] conduct or having a religious experience" and that this interference is "more than an inconvenience." *Bryant,* 46 F.3d at 949.The burden imposed on the religious practices of the Navajo and Hopi is certainly as substantial as the intrusion on confession deemed a "substantial burden" in *Mockaitis*, 104 F.3d at 1531, and the denial of a Halal or Kosher meat diet deemed a "substantial burden" in *Shakur*, 514 F.3d at 888-89. Thus, under RFRA, the Forest Service's approval of the Snowbowl expansion may only survive if it furthers a compelling governmental interest by the least restrictive means.

### c. "Compelling Governmental Interest" and "Least Restrictive Means"

The majority refuses to hold that spraying treated sewage effluent on Humphrey's Peak imposes a "substantial burden" on the Indians' "exercise of religion." It therefore does not reach the question whether the burden can be justified by a compelling interest and is the least restrictive means of furthering that purpose. Because I would hold that the Snowbowl expansion does constitute a substantial burden on the Indians' religious exercise, I also address this second step of the RFRA analysis.

"Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law." *City of Boerne*, 521 U.S. at 534. In applying this standard, we do not accept a generalized assertion of a compelling interest, but instead require "a case-by-case determination of the question, sensitive to the facts of each particular claim." *O Centro*, 546 U.S. at 431 (quoting *Smith*, 494 U.S. at 899 (O'Connor, J., concurring in the judgment)).

The Forest Service and the Snowbowl have argued that approving the use of treated sewage effluent to make artificial snow serves several compelling governmental interests. The

district court characterized those interests as: (1) "selecting the alternative that best achieves [the Forest Service's] multiple-use mandate under the National Forest Management Act," which includes "managing the public land for recreational uses such as skiing"; (2) protecting public safety by "authorizing upgrades at Snowbowl to ensure that users of the National Forest ski area have a safe experience"; and (3) complying with the Establishment Clause. 408 F. Supp. 2d at 906. I would hold that none of these interests is compelling.

First, the Forest Service's interests in managing the forest for multiple uses, including recreational skiing, are, in the words of the Court in *O Centro*, "broadly formulated interests justifying the general applicability of government mandates" and are therefore insufficient on their own to meet RFRA's compelling interest test. 546 U.S. at 431. Appellees have argued that approving the proposed action serves the more particularized compelling interest in providing skiing at the Snowbowl, because the use of artificial snow will allow a more "reliable and consistent operating season" at one of the only two major ski areas in Arizona. I do not believe that authorizing the use of artificial snow at an already functioning commercial ski area in order to expand and improve its facilities, as well as to extend its ski season in dry years, is a governmental interest "of the highest order." *Yoder*, 406 U.S. at 215.

Second, while the Forest Service undoubtedly has a general interest in ensuring public safety on federal lands, there has been no showing that approving the proposed action advances that interest by the least restrictive means. Appellees have provided no specific evidence that skiing at the Snowbowl in its current state is unsafe.

Third, approving the proposed action does not serve a compelling governmental interest in avoiding conflict with the Establishment Clause. The Forest Service has not suggested that avoiding a conflict with the Establishment Clause is a

compelling interest served by the proposed action. Only the Snowbowl has made that argument. The argument is not convincing. The Supreme Court has repeatedly held that the Constitution "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). "Anything less would require the 'callous indifference' we have said was never intended by the Establishment Clause." *Id.* (citations omitted); *see also Hobbie v. Unemp. App. Comm'n of Fla.*, 480 U.S. 136, 144-45 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause."). Refusing to allow a commercial ski resort in a national forest to spray treated sewage effluent on the Indians' most sacred mountain is an accommodation that falls far short of the sort of advancement of religion that gives rise to an Establishment Clause violation.

## F.  Conclusion

I would therefore hold that the proposed expansion of the Arizona Snowbowl, which would entail spraying up to 1.5 million gallons per day of treated sewage effluent on the holiest of the San Francisco Peaks, violates RFRA. The expansion would impose a "substantial burden" on the Indians' "exercise of religion" and is not justified by a "compelling government interest."

## II.  National Environmental Protection Act

## A.  Pleading under Rule 8(a)

The majority concludes that Appellants failed properly to plead a violation of NEPA in their complaint. The violation in question is an alleged failure by the Forest Service to analyze the risks posed by human ingestion of artificial snow made with treated sewage effluent. Because of the asserted

pleading mistake, the majority declines to reach the merits of the claimed violation.

Under Federal Rule of Civil Procedure 8(a), a proper complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8(a), adopted in 1938, replaced the old "code pleading" regime under which plaintiffs had been required to plead detailed factual allegations in the complaint, on pain of having their complaints dismissed on demurrer. Under the more relaxed "notice pleading" requirement of Rule 8(a), a plaintiff is not required to plead detailed facts. Under Rule 8(a), a plaintiff is required only to "advise the other party of the event being sued upon, . . . provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and . . . indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this." 5 C. Wright & A. Miller, Federal Practice & Procedure § 1202 (2008).

Appellants' complaint in the district court, while general, was sufficient to provide notice that they were asserting NEPA violations based on the Forest Service's failure to consider the health risks presented by the Snowbowl expansion. The Navajo Nation and the Havasupai Tribe both alleged in their complaints that the Forest Service violated NEPA by "fail[ing] to take a 'hard look' at the impacts of introducing reclaimed waste water to the ecosystem." [SER 1184; 1200]. In particular, they alleged, "The FEIS fails to adequately address the effects of soil disturbance, and the persistent pollutants in reclaimed water." *Id.*

In another context, generalized allegations such as these might be insufficient to alert defendants that a specific health risk, such as the ingestion of artificial snow, was included in general statements referring to "the impacts of introducing reclaimed waste water to the ecosystem" and "persistent pollutants in reclaimed water." In the context of this case, how-

ever, Appellants' allegations were sufficient to put defendants on notice of the nature of their NEPA claim.

First, even before the complaint was filed, the Forest Service was well aware of the dispute about whether the FEIS adequately addressed the risk of children and others ingesting artificial snow made from treated sewage effluent. For example, in October 2002, before the draft EIS was published, the Service wrote what it called a "strategic talking point" addressing the risk posed by the ingestion of the artificial snow. The "talking point" began with the question: "Will my kids get sick if they eat artificial snow made from treated wastewater?" It continued with a scripted answer: "[T]his question is really one that will be thoroughly answered in the NEPA analysis process." Appellants repeatedly made clear to the Forest Service, both in comments on the draft EIS and in administrative appeals, that this risk needed to be addressed as part of the NEPA process.

Second, Appellants raised the issue of ingestion of artificial snow in their motion for summary judgment, specifically addressing several pages to the following argument: "The FEIS Does Not Contain a 'Reasonably Thorough Discussion of the Significant Aspects of the Probable Environmental Consequences' of the Project — The FEIS Ignores (In Part) the Possibility of Children Eating Snow Made from Reclaimed Water." [Plaintiffs' Motion for Summary Judgment at 20-23]. The Forest Service and the Snowbowl both objected that this argument was not adequately alleged in the complaint. But they showed no prejudice arising out of the alleged lack of notice, and they addressed the merits of the issue in their opposition to the motion. [Defendant's Response In Opposition to All Plaintiffs' Motions for Summary Judgment at 16-17; Arizona Snowbowl Resort LP's Opposition to Plaintiffs' Motions for Summary Judgment at 5-6].

Third, Appellants had raised the issue of ingestion of artificial snow in their administrative appeal, and the Forest Ser-

vice had no need to develop additional evidence, through discovery or otherwise, in order to address the issue in the district court.

The majority objects to this analysis on two grounds. First, it contends that because Appellants have not appealed the district court's denial of their motion to amend their complaint, they cannot now contend that their complaint was adequate. Maj. op. at 10070-71 & n.26. That is not the law. If a complaint is adequate under Rule 8(a), there is no need to amend it. It is well established that if a plaintiff believes that a complaint satisfies Rule 8(a), he or she may stand on the complaint and appeal a dismissal to the court of appeals. *See WMX Technologies, Inc. v. Miller*, 80 F.3d 1315, 1318 (9th Cir. 1996) (citing *Carson Harbor Village Ltd. v. City of Carson*, 37 F.3d 468, 471 n.3 (9th Cir. 1994) (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1053 (9th Cir.1992))). A plaintiff may move to amend a complaint that, in the view of the district court, is inadequate under Rule 8(a). But making such a motion is not an admission, for purposes of appeal, that the district court is correct in viewing the complaint as inadequate. Nor, having made such a motion, is the plaintiff required to appeal the district court's denial of that motion in order to assert that the initial complaint was adequate. *See, e.g.*, *Quinn v. Ocwen Federal Bank FSB*, 470 F.3d 1240, 1247 n.2 (8th Cir. 2006).

Second, the majority contends that the Navajo Appellants "do not explain why their complaint is otherwise sufficient to state this NEPA claim—despite the Defendants' assertion that the Navajo Plaintiffs failed to plead this NEPA claim." Maj. op. at 10070. The majority is wrong. The Navajo Appellants clearly "explain" why their complaint was sufficient. Part III.B of their brief in this court is headed: "The FEIS Ignores the Possibility of Children Eating Snow Made from Reclaimed Water." Part III.B.3 of their brief is headed: "This Issue Was Properly Raised and Considered by the Lower

Court." [Reply brief, at 19] The first paragraph of Part III.B.3 reads:

> Defendants assert that Plaintiffs did not raise this issue in their comments on the the DEIS, in their administrative appeal, *or in their Complaint*. As a result, according to defendants, Plaintiffs are precluded from raising this argument on appeal. *This misstates the facts of the case and applicable law*.

[*Id.*] (Emphasis added).

The Navajo Appellants explain in their brief that the issue of children eating snow made from effluent was raised during the preparation of the FEIS. They explain that defendants were therefore already well aware of this issue when it was raised in the district court. They explain, further, in their brief in this court: "Plaintiffs properly pled violations of NEPA in their Complaint, even though the specific allegations at issue were not included therein. The issue [of the FEIS's failure to analyze the risk of children ingesting snow made from treated effluent] was briefed at summary judgment by all parties and presented at oral argument. The lower court heard the argument . . . and issued a decision on this claim resulting in this appeal." *Id.* at 23-4.

Under notice pleading, a plaintiff need not make specific allegations in the complaint, so long as the complaint is sufficient to put defendant on notice of the nature of plaintiff's claim. As the Navajo Appellants make clear, the defendants in the district court were well aware of the nature of plaintiffs' claim that the FEIS failed to analyze the risk of children eating snow made from the effluent. This is sufficient to satisfy the notice pleading requirement of Rule 8(a).

I would therefore reach the merits of Appellants' claim that the Forest Service failed to study adequately the risks posed

by human ingestion of artificial snow made with treated sewage effluent.

## B.    Merits

"NEPA 'does not mandate particular results,' but 'simply provides the necessary process' to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Regulations require that an EIS discuss environmental impacts "in proportion to their significance." 40 C.F.R. § 1502.2(b). For impacts discussed only briefly, there should be "enough discussion to show why more study is not warranted." *Id.*

We employ a " 'rule of reason [standard] to determine whether the [EIS] contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences.' " *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (first alteration in original) (quoting *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)). In reviewing an EIS, a court must not substitute its judgment for that of the agency, but rather must uphold the agency decision as long as the agency has "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953-54 (9th Cir. 2003) (quoting *Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir. 1990)).

The treated sewage effluent proposed for use in making artificial snow at the Snowbowl meets the standards of the ADEQ for what Arizona calls "A+ reclaimed water." The ADEQ permits use of A+ reclaimed water for snowmaking, but it has specifically disapproved human ingestion of such water. Arizona law requires users of reclaimed water to "place and maintain signage at locations [where the water is used] so

the public is informed that reclaimed water is in use and that no one should drink from the system." Ariz. Admin. Code § R18-9-704(H) (2005). Human consumption, "full-immersion water activity with a potential of ingestion," and "evaporative cooling or misting" are all prohibited. *Id.* § R18-9-704(G)(2). Irrigation users must employ "application methods that reasonably preclude human contact," including preventing "contact with drinking fountains, water coolers, or eating areas," and preventing the treated effluent from "standing on open access areas during normal periods of use." *Id.* § R18-9-704(F).

The FEIS does not contain a reasonably thorough discussion of the risks posed by possible human ingestion of artificial snow made from treated sewage effluent, and it does not articulate why such discussion is unnecessary.

The main body of the FEIS addresses the health implications of using treated sewage effluent in subchapter 3H, "Watershed Resources." Much of the subchapter's analysis focuses on the "hydrogeologic setting" and on the effect of the artificial snow once it has melted. The part of the subchapter describing the treated sewage effluent acknowledges that its risks to human health are not well known because it contains unregulated contaminants in amounts not ordinarily found in drinking water, including prescription drugs and chemicals from personal care products. The subchapter contains tables listing the amounts of various organic and inorganic chemical constituents that have been measured in the treated sewage effluent. One table compares the level of contaminants in Flagstaff's treated sewage effluent to the level permitted under national drinking water standards. The table shows that Flagstaff simply does not test for the presence of the following contaminants regulated by the national standards: Acrylamide, Dalapon, Di(2-ethylhexyl) adipate, Dinoseb, Diquat, Endothall, Epichlorohydrin, Ethylene dibromide, Lindane, Oxamyl (Vydate), Picloram, Simazine, and Aluminum. The table also shows that Flagstaff does not mea-

sure the following contaminants with sufficient precision to determine whether they are present at levels that exceed the national standards: Nitrate, Benzo (a) pyrene (PAHs), Penta-chlorophenol, and Polychlorinatedbiphenyls (PCBs). However, the FEIS does not go on to discuss either the health risks resulting from ingestion of the treated sewage effluent or the likelihood that humans — either adults or children — will in fact ingest the artificial snow.

Instead, the environmental impact analysis in subchapter 3H, the only part of the FEIS to discuss the characteristics of treated sewage effluent, addresses only the impact on the watersheds and aquifers. That analysis assesses the treated sewage effluent's impact after it has filtered through the ground, a process the FEIS estimates may result in "an order of magnitude decrease in concentration of solutes." Thus, although the subchapter reasonably discusses the human health risks to downgradient users, it does not address the risks entailed in humans' direct exposure to, and possible ingestion of, undiluted treated sewage effluent that has not yet filtered through the ground.

Only two statements in the FEIS could possibly be mistaken for an analysis of the risk that children would ingest the artificial snow. The first follows three combined questions by a commenter: (1) whether signs would be posted to warn that "reclaimed water" has been used to make the artificial snow; (2) how much exposure to the snow would be sufficient to make a person ill; and (3) how long it would take to see adverse effects on plants and animals downstream. The response to these questions is four sentences long. It states that signs would be posted, but it does not say how numerous or how large the signs would be. It then summarizes the treatment the sewage would undergo. The final sentence asserts: "In terms of microbiological and chemical water quality, the proposed use of reclaimed water for snowmaking represents a low risk of acute or chronic adverse environmental impact to plants, wildlife, and humans."

This response does not answer the specific and highly relevant question: How much direct exposure to the artificial snow is safe? Nor does the response provide any analysis of the extent of the likely "exposure," including the likelihood that children or adults would accidentally or intentionally ingest the snow made from non-potable treated sewage effluent.

Another statement appears on the last page of responses to comments in the FEIS. The questions and response are:

> [Question:] In areas where reclaimed water is presently used, there are signs posted to warn against consumption of the water. Will these signs be posted at the Snowbowl? If so, how will that keep children from putting snow in there [sic] mouths or accidentally consuming the snow in the case of a wreck?

> [Answer:] There will be signs posted at Snowbowl informing visitors of the use of reclaimed water as a snowmaking water source. Much like areas of Flagstaff where reclaimed water is used, it is the responsibility of the visitor or the minor's guardian to avoid consuming snow made with reclaimed water. It is important to note that machine-produced snow would be mixed and therefore diluted with natural snow decreasing the percentage of machine-produced snow within the snowpack. Because ADEQ approved the use of reclaimed water, it is assumed different types of incidental contact that could potentially occur from use of class A reclaimed water for snowmaking were fully considered.

There are several problems with this response. First, the response does not assess the risk that children will eat the artificial snow. Stating that it is the parents' responsibility to prevent their children from doing so neither responds to the

question whether signs would prevent children from eating snow nor addresses whether ingesting artificial snow would be harmful. Second, the Forest Service's assumption that the ADEQ's approval means the snow must be safe for ingestion is inconsistent with that same agency's regulations, which are designed to prevent human ingestion. Third, the assumption that the ADEQ actually analyzed the risk of skiers ingesting the treated sewage effluent snow is not supported by any evidence in the FEIS (or elsewhere in the administrative record). Finally, the Forest Service's answer is misleading in stating that the treated sewage effluent will be "diluted." The artificial snow would itself be made entirely from treated sewage effluent and would only be "mixed and therefore diluted" with natural snow insofar as the artificial snow intermingles with a layer of natural snow. During a dry winter, there may be little or no natural snow with which to "dilute" the treated sewage effluent.

Appellees have also contended that the FEIS "sets forth relevant mitigation measures" to "the possibility that someone may ingest snow." Although Appellees have not specified the "relevant mitigation measures" to which they refer, the only mitigation measure mentioned in the FEIS is the requirement under Arizona law that the Snowbowl post signs "so the public is informed that reclaimed water is in use and that no one should drink from the system." Ariz. Admin. Code § R18-9-704(H) (2005). This "mitigation measure" is not listed along with the fifty-five mitigation measures catalogued in a table in the FEIS. *Cf.* 40 C.F.R. § 1502.14(f) (requiring agencies to include "appropriate mitigation measures" in the EIS's description of the proposal and its alternatives). The measure's omission from the FEIS table is hardly surprising, however, given that the FEIS does not address as an environmental impact the risk to human health from the possible ingestion of artificial snow made from treated sewage effluent.

Our role in reviewing the FEIS under the APA is not to second-guess a determination by the Forest Service about

whether artificial snow made from treated sewage effluent would be ingested and, if so, whether such ingestion would threaten human health. We are charged, rather, with evaluating whether the FEIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Ctr. for Biological Diversity*, 349 F.3d at 1166 (quotation marks omitted). An agency preparing an EIS is required to take a "hard look" that "[a]t the least . . . encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 185 (4th Cir. 2005) (citing *Robertson*, 490 U.S. 332, 350 (1989) (stating that NEPA requires environmental costs to be "adequately identified and evaluated")). A proper NEPA analysis will "foster both informed decisionmaking and informed public participation." *Churchill County v. Norton*, 276 F.3d 1060, 1071 (9th Cir. 2001) (quoting *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982)).

I do not believe that the Forest Service has provided a "reasonably thorough discussion" of any risks posed by human ingestion of artificial snow made from treated sewage effluent or articulated why such a discussion is unnecessary, has provided a "candid acknowledgment" of any such risks, and has provided an analysis that will "foster both informed decisionmaking and informed public participation." I would therefore hold that the FEIS does not satisfy NEPA with respect to the possible risks posed by human ingestion of the artificial snow.

### III.   Conclusion

I would hold that Appellants have proved violations of both the Religious Freedom Restoration Act and the National Environmental Policy Act. Of the two, the RFRA violation is by far the more serious. A NEPA violation can almost always be cured, and certainly could be cured in this case. However, the RFRA violation resulting from the proposed development of

the Snowbowl is not curable. Because of the majority's decision today, there will be a permanent expansion of the Arizona Snowbowl. Up to 1.5 million gallons of treated sewage effluent per day will be sprayed on Humphrey's Peak for the foreseeable future.

The San Francisco Peaks have been at the center of religious beliefs and practices of Indian tribes of the Southwest since time out of mind. Humphrey's Peak, the holiest of the San Francisco Peaks, will from this time forward be desecrated and spiritually impure. In part, the majority justifies its holding on the ground that what it calls "public park land" is land that "belongs to everyone." Maj. op. at 10042. There is a tragic irony in this justification. The United States government took this land from the Indians by force. The majority now uses that forcible deprivation as a justification for spraying treated sewage effluent on the holiest of the Indians' holy mountains, and for refusing to recognize that this action constitutes a substantial burden on the Indians' exercise of their religion.

RFRA was passed to protect the exercise of all religions, including the religions of American Indians. If Indians' land-based exercise of religion is not protected by RFRA in this case, I cannot imagine a case in which it will be. I am truly sorry that the majority has effectively read American Indians out of RFRA.